THOMAS D. REILLY, Respondent, *v.* MILTON C. GRAY, Appellant.

*Constitutional prohibition against lotteries — does not apply to pool selling — chapter 479 of the Laws of 1887 is a general act — construction of a statute.*

A lottery is a scheme for the distribution of prizes by chance, either in money or in specific articles of other property.

In construing a provision of the Constitution of the State of New York, its history and the conditions and circumstances attending its adoption must be kept in view.

It was not the intention of the framers of the Constitution, either of 1821 or 1846, in the use of the word "lottery," to include in it the subject of betting as then prohibited by statute.

The constitutional prohibition against lotteries does not apply to pool selling, which is classed with betting and is a development thereof.

Chapter 479 of the Laws of 1887 is not a private or local bill within the purview of section 16 of article 3 of the Constitution of the State of New York, nor is it within the provisions of section 18 of such article. It is a general act applicable to all associations of the character referred to therein in any part of the State, and is constitutional.

A court has nothing to do with the purposes or effect of an act of the Legislature, providing the Legislature has power to pass it, and the same rules of construction must be applied in all similar cases.

A statute will not be declared unconstitutional unless a clear and substantial conflict exists between it and the Constitution.

APPEAL by the defendant, Milton C. Gray, from an interlocutory judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Herkimer on the 26th day of January, 1894, upon the decision of the court rendered at the Oneida Special Term, overruling the demurrer to the complaint.

The allegations of the complaint are in substance as follows:

At the times mentioned in the complaint the Saratoga Racing

Association was a domestic corporation, duly organized and incorporated under and pursuant to the laws of this State, for the purpose of improving the breed of horses, and it owned and conducted a race track and grounds situated in the county of Saratoga. Between the 15th day of May and the 15th day of October, 1892, at the said race grounds and race track and within the inclosure of the grounds, there were given and conducted by the said association upon its race course, and during thirty days only between the dates above named, certain races and trials of speed, strength and endurance of certain thoroughbred horses, and on those days the said races and grounds were kept open for the admission of the public.

Pursuant to chapter 479 of the Laws of 1887, there was conducted during the said thirty days at the said race track and grounds and within the inclosure thereof certain pool selling, being a scheme and device for the purpose of enabling persons who might be there present to bet and wager and to form pools dependent upon the result of each of the said races or contests. The pool selling, referred to in said act and which was so conducted upon the said race track and grounds, consisted of certain schemes known by the names of " auction pool," " French pool " and " bookmaking."

The auction pool was conducted as follows : A certain number of horses being entered to run in a certain race to be held at a certain time, any person desiring to invest money in the pool and bet on the race offers to the auctioneer or person conducting the pool a certain amount of money for the choice or selection of a horse from those entered in the race, which he supposes will be the winner. A number of bids may be offered for the first choice. The person offering the highest amount obtains the first choice of the horse which he supposes will be the winner, and he then and there names the horse selected by him and deposits the amount he has so offered for the first choice in the hands of the auctioneer or the person conducting the pools. It often occurs that after several different choices are made by various persons bidding, there remains a number of horses in the race undisposed of. These are called " the field." These are taken together by the person or persons offering and depositing the highest amount for the same. The amount so deposited for each choice and the field (if there is a field) are added together and the whole constitutes what is called " the

pool." Each person so depositing his money on his choice or on the field receives a card or receipt for the same, showing the horse or (if on the field) the horses selected, the amount so deposited and the total amount in the pool. The money in the pool (less the commission of the person conducting the pool) is paid to the person who selected the winning horse in the race, or, if one of the horses in the field won the race, to the person or persons who bought the field, after the determination of the race, and upon the presentation to the conductor of the pools of the card or receipt which is held by the winner.

The French pool, so called, was conducted as follows : A list of the horses in a certain race then to be run is placed on an indicator, in open view, and to each horse contending in the race is assigned a number, a clear space being reserved for the name of each horse, with a separate dial attached which shows the number of times the horse has been chosen. A person wishing to invest money on a certain horse, purchases of the person having charge of the pool, a card or receipt commonly called "a ticket," stating at the time to the one having charge, the horse upon which he wished to purchase the ticket. The ticket so received has on its face the number corresponding with the number which is attached to the name of the horse on the indicator. When the purchase has been made there is shown on an indicator, placed in open view, the whole number of cards, receipts or tickets that have been sold or taken on the race, and this is done from time to time as each ticket is purchased or taken. When the pool is closed the whole amount invested on the different horses, or the amount of the different cards or tickets taken on the different horses in the race, is added together and shown on a different dial in open view, called "the total;" which constitutes the pool. The total (less the commission of the person conducting the pool) is, after the termination of the race, divided in equal sums among and paid to the persons who have selected and purchased cards or tickets on the horse winning the race, upon the presentation of their cards or tickets. Any number of persons acting separately may choose the same or any horse in the race, and the amount paid for each card or ticket is the same. The number of cards or tickets sold or taken on each horse is unlimited, and any person may buy or take as many cards or tickets on each or upon any horse in the race as he chooses.

The bookmaking referred to was a scheme for the distribution of money dependent upon the result of the race, and was conducted by the persons known as bookmakers, who offer to bet or wager upon any horse contending or running in any race. Any person upon the said track or grounds might apply to any bookmaker to bet upon any horse engaged or running in any of the races, and the said bookmaker makes the pool and becomes the owner of the money, so to speak, in case the horse upon which the money is so staked fails to win the race.

On the 1st day of August, 1892, that being one of the thirty days upon which races were given on said race track, and one of the days upon which, under the act of 1887, they might be there run and conducted, and pool selling also be there conducted, the defendant, pretending the same to be lawful, then and there conducted such pool selling according to the methods above described as " auction pool " and " French pool." At that date the plaintiff, when the races were being given and upon the grounds and within the inclosure thereof, purchased from the defendant a pool known as a French pool, conducted by defendant as above described, and did bet and wager, and did deposit and pay to defendant, and defendant received from plaintiff, the sum of $600 for the purpose that the same should be bet and staked and for an interest in such pool, dependent upon the result of a certain race, then and there, on said 1st day of August, 1892, to take place at the race track between divers horses entered in the race, among which was one thoroughbred horse known by the name Postmaster, and one other thoroughbred horse known by the name Governor Foraker. The money so staked, bet and invested was bet and wagered in all respects according to the method of the French pool, and was dependent upon the horse Postmaster winning the race, and the defendant received the same for such purpose. The schemes of pool selling in which the defendant was engaged and the pool in which plaintiff invested was at that time and place unlawful, and defendant illegally received the said $600 from the plaintiff.

At the same date and place the plaintiff, when the races were being run, and upon the grounds and within the inclosure thereof, purchased from the defendant another pool known as the " auction pool," then and there conducted by defendant, according to the method of auction pool above described, and did in that manner

bet, deposit and pay to the defendant, and the defendant received from the plaintiff, the sum of $550 for the purpose that the same should be bet and staked, and for an interest in such auction pool, dependent upon the result of the race then and there to take place between divers horses, among which was the horse Postmaster and the horse Governor Foraker. The money so staked was bet and wagered according to the method of the auction pool, and was dependent upon the horse Postmaster winning the race, and the defendant received the same for such purpose. That scheme of pool selling and the pool in which plaintiff so bet and invested his money is and was at that time and place unlawful, and the defendant illegally received the said $550 from the plaintiff.

Subsequent to August 1, 1892, and before the commencement of this action, the plaintiff duly demanded of defendant the said moneys, and the defendant refused to pay.

The defendant demurred upon the ground that the complaint does not state facts sufficient to constitute a cause of action.

*Milton C. Gray* and *W. A. Matteson,* for the appellant.

*A. M. Mills,* for the respondent.

MERWIN, J.:

There is practically no doubt that as the law stood prior to the passage of chapter 479 of the Laws of 1887, the transactions described in the complaint were unlawful and prohibited, and the money which the plaintiff lost could be recovered of the defendant. It is also quite evident that the Legislature, by the act of 1887, intended to legalize pool selling at certain horse races. It was so held in *Brennan* v. *Brighton Beach Racing Association* (56 Hun, 188) and that a pool-selling contract could be enforced. Under the allegations of the complaint, we must assume that the pool-selling transactions between the plaintiff and defendant were covered by the provisions of the act of 1887, so that if that act is valid the plaintiff has no cause of action. To meet this aspect of the case the plaintiff claims that the act of 1887 is invalid, upon the ground that it is in violation of that part of section 10 of article 1 of the Constitution of the State which provides as follows : " Nor shall any lottery hereafter be authorized, or any sale of lottery tickets allowed

within this State." This contention of the plaintiff was sustained at the Special Term, and the act in that respect was held to be unconstitutional.

The question then is whether the pool selling, in the management of which the defendant was engaged, was a lottery, within the meaning of the Constitution. We are referred to no direct authority upon this subject in this State. The question might have been raised in the *Brennan* case, above cited, but apparently it was not. We are referred to several cases in other jurisdictions that are claimed to have a bearing. In *State* v. *Lovell* (10 Vroom [39 N. J. L.], 458), decided in 1877, it was held that auction pools and French pools upon horse races, like those here in controversy, were lotteries within the Crimes Act of that State. The particular provisions of that act do not appear in the report. The charge against the defendant was the setting up of a lottery for money and selling a lottery ticket therein. In *Tollett* v. *Thomas* (L. R. [6 Q. B.] 514) it was held that a scheme for betting on horse races, quite similar to the French pool, was a game of chance, not because of the uncertainty of the event of the race, but because of the uncertainty in the final amount of the stakes. In *People* v. *Reilly* (50 Mich. 384), decided in 1883, it was held that pool selling, where the pools were made up of amounts bid for the privilege of selecting horses out of those running in races, and of bets of as many as saw fit to do so by purchasing checks deposited on base-ball matches, where those who bet on the winning combination received the pool, did not constitute " a lottery for disposing of money," within the meaning of a municipal ordinance against keeping any "lottery, policy, pool, bucket shop, board of trade or any like scheme or place for drawing or disposing of money, wheat or other property within the city." In *Buckalew* v. *State* (62 Ala. 334), where the theory of the game was that several persons contributed equal sums to a common purse which was awarded to the contributor whom chance so favored as to register for him the highest number in the whirl of a hand upon a pivot, this was held not to constitute a lottery.

Generally speaking, a lottery is a scheme for the distribution of prizes by chance. (2 Bouvier's Law Dict. 127.) The prizes may be in money or in specific articles of other property. In Bishop on Statutory Crimes (§ 954) it is said to be an essential element that

the lot is in some way to be cast or ascertained by the managers of the scheme. By the Penal Code (§ 323) a lottery is defined to be "a scheme for the distribution of property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether called a lottery, raffle or gift enterprise, or by some other name."

In the Penal Code pool selling is not considered in the chapter concerning "lotteries" but is in the chapter concerning "gaming" and is classified with bets and wagers. The term seems to have first appeared in our penal statutes in chapter 178 of the Laws of 1877, entitled "An act in relation to bets, wagers and pools."

In *Commonwealth* v. *Ferry* (146 Mass. 203) a pool is defined to be a combination of stakes, the money derived from which is to go to the winner. It is there said that registering bets and selling pools are not distinct kinds of unlawful business, but different parts of one transaction, representing different stages of it.

Pool selling, as described in the complaint, is simply a scheme for facilitating betting on horse races. The manager is the stakeholder. The bettor deposits his money and selects his horse. In one kind of pool the highest bettor has the first choice of horses. The event of the race determines the winner, and he gets the whole, less the commissions of the manager. There exist all the characteristics of betting. The fact that several may combine upon the same horse does not change the character of the transaction. The pool manager has nothing to do with the race, or with the moneys, except to safely hold them until the race is decided, and then hand them over to the winner or winners, less his commissions. The essence of the whole thing is the betting, and that should determine the category to which such transactions belong.

The provision of the Constitution of 1846 was in substance the same as in that of 1821. The latter was : "No lottery shall hereafter be authorized in this State ; and the Legislature shall pass laws to prevent the sale of all lottery tickets within this State, except in lotteries already provided for by law." (Art. 7, § 11.) For many years prior to 1821 there had existed laws for the prohibition of all lotteries other than such as should be authorized by the Legislature. (See chap. 12, Laws of 1783; 1 R. L. of 1813, chap. 198, page 270 ; chap. 206 of 1819.) The Legislature, however, had by

special acts authorized them to such an extent as to call for a constitutional prohibition. Evidently it was not deemed wise to trust the Legislature on the subject. Hence, the provision in the Constitution of 1821, and continued in the Constitution of 1846.

There had also existed prior to 1821 a law for the prevention of betting upon horse races or on any game of chance. (See chap. 44, Laws of 1802 ; 1 R. L. of 1813, 222.) This in substance was carried into the Revised Statutes of 1827–1830. (1 R. S. pt. 1, chap. 20, art. 3.) This was a subject distinct from the subject of lotteries and was so treated in the Revised Statutes and in the prior laws. The one was forbidden in the Constitution and the other was not.

In Cooley's Constitutional Limitations (6th ed. 69) it is said : " The meaning of the Constitution is fixed when it is adopted, and it is not different at any subsequent time when a court has occasion to pass upon it. The object of construction, as applied to a written Constitution is to give effect to the intent of the People in adopting it." In construing a provision of the Constitution, its history and the conditions and circumstances attending its adoption must be kept in view. (*Sweet* v. *City of Syracuse*, 129 N. Y. 316.)

It seems to me very clear that it was not the intention of the framers of the Constitution, either of 1846 or 1821, in the use of the word " lottery," to include in it the subject of betting as then prohibited by statute. They were distinct subjects upon the statute book and in the public mind, and if the design had been to cover both they would have been named. It is not enough to say that they both involve to some extent the same kind of evil. It may be difficult to precisely define the difference between the two. It may be said, as in *People* v. *Elliott* (74 Mich. 264, 268), that in betting there is an opportunity for the exercise of reason and judgment, while in a lottery there is no such opportunity. It may be said that betting is not a distribution of property, but an agreement to pay the winner certain sums in a certain contingency or that the winner shall have certain sums which are deposited as stakes. But be the distinction what it may, it is very clear, from the state of the statutory law in 1846 as well as in 1821, that betting upon a horse race was not then understood to be a lottery. That being so, we

must assume that it was not meant to be included in the term "lottery" as used in the Constitution. The same rule must apply to the pool selling complained of, as it must be classed with betting and is a development, a combination, in the same line. It follows, therefore, that the constitutional prohibition against lotteries does not apply.

Some other objections to the law of 1887 were raised at the Special Term, but they were held not to be tenable. In this regard we think the Special Term was correct. The act is not a private or local bill within the purview of section 16 of article 3 of the Constitution. (*People ex rel. N. Y. Electric Lines Co.* v. *Squire,* 107 N. Y. 601.) Nor is it within the provisions of section 18 of the same article. The act is a general one, applicable to all associations of the character referred to in any part of the State. Nor do the cases of *Matter of Jacobs* (98 N. Y. 98) and *People* v. *Marx* (99 id. 377) apply. No constitutional rights of the plaintiff are infringed upon, as in those cases.

Our attention is called to the peculiar character of the act of 1887 and its purpose and effect. It seems to be somewhat anomalous. But with this we have nothing to do, provided the Legislature had power to pass it. We must apply to the case the same rule of construction as in other similar cases. If the law is in fact improper and a source of evil and still within the power of the Legislature, the responsibility and the remedy are with the Legislature, and not with the courts. It has been held in many cases that a statute will not be declared unconstitutional unless a clear and substantial conflict exists between it and the Constitution. (*People* v. *Gillson,* 109 N. Y. 397; *People ex rel. Carter* v. *Rice,* 135 id. 484.) We do not find in the present case such a conflict.

It follows that the judgment must be reversed.

MARTIN, J., concurred; HARDIN, P. J., not voting.

Interlocutory judgment reversed, with costs, and demurrer sustained, with costs, with leave to plaintiff to amend his complaint within twenty days, upon payment of costs of demurrer and of this appeal.