PEOPLE ex rel. ELLISON v. LAVIN, Police Officer.

(Supreme Court, Appellate Division, First Department. April 15, 1904.)

1. LOTTERY—ESTIMATES OF NUMBER OF CIGARS TAXED—DISTRIBUTION BY CHANCE.

Where prizes were offered to those sending bands of certain makes of cigars for the closest estimates of the number of cigars on which $3 tax per thousand would be paid in a certain month, the number on which the tax was paid in each month for three years being published in connection with the offer, the distribution of prizes was not by chance, within Pen. Code, § 323, defining lotteries as a distribution of money by chance, etc., and hence the advertisement of the offer was not a violation of Pen. Code, § 327, prohibiting advertising on account of a lottery; especially in view of the history of legislation concerning lotteries and gambling.

Van Brunt, P. J., and Ingraham, J., dissenting.

Appeal from Special Term, New York County.

Application by the people, on the relation of Ismar S. Ellison, against Patrick Lavin, police officer, for a writ of habeas corpus. From an order sustaining the writ and discharging the relator from custody, the people appeal. Affirmed.

Appeal by the people of the state of New York from an order sustaining a writ of habeas corpus and discharging the relator from custody. The return of the police officer shows that he arrested and held the relator by virtue of a warrant duly issued by a justice of the Court of Special Sessions, commanding the arrest of the relator upon information duly filed that the relator was guilty of the crime of advertising a lottery, in violation of section 327 of the Penal Code. The relator traversed the return presenting the depositions upon which the warrant was issued. The depositions showed that the relator was the sole editor and proprietor of the United States Tobacco Journal, a weekly trade journal published in the city of New York, and circulated throughout the United States "among the leaf tobacco trade," and that on the 9th day of May in the year 1903 he published in the said United States Tobacco Journal an advertisement of the Florodora Tag Company of Jersey City, N. J., as follows:

"The United States Tobacco Journal.

"Save Cigar Bands.

"Another Free Distribution of $142,500.00 Will be Made in December, 1903, Based on the Month of November, 1903,

"To Smokers of

| | |
|---|---|
| Cremo | Wego |
| Cubanola | Nerve |
| George W. Childs | Star |
| Jackson Square | Lillian Russell |
| Premios | Turco |
| Exports | Velvet |
| La Belle Creole (10c) | Continental (10c) |
| Fontella | Detroit Free Press |
| Renown | Siona |
| Salva Fuma | Spaniola |
| Santa Bana | Two Orphans (2 for 5c) |
| Peola | Benefactor |
| Smokettes | Florodora (3 for 10c) |
| Columbia (10c) | Florodora Operas (5 for 10c) |
| Dowledo | Pioneer |

"How many cigars (of all brands, no matter by whom manufactured) will the United States collect taxes on during the month of November, 1903?

"(Cigars bearing $3.00 tax per thousand.)

"The persons who estimate nearest to the number of cigars on which $3.00 tax per thousand is paid during the month of November, 1903, as shown by the total sales of stamps made by the United States Internal Revenue Department during November, 1903, will be rewarded as follows:

| | | |
|---|---|---|
| To the (1) person estimating the closest.................... | $ 5,000 | in cash |
| To the (2) persons whose estimates are next closest ($2,500 each) ......................................... | 5,000 " " |
| To the (5) persons whose estimates are next closest ($1,000.00 each) ....................................... | 5,000 " " |
| To the (10) persons whose estimates are next closest ($500.00 each) ....................................... | 5,000 " " |
| To the (20) persons whose estimates are next closest ($250.00 each) ....................................... | 5,000 " " |
| To the (25) persons whose estimates are next closest ($100.00 each) ....................................... | 2,500 " " |
| To the (50) persons whose estimates are next closest ($50.00 each) ....................................... | 2,500 " " |
| To the (100) persons whose estimates are next closest ($25.00 each) ....................................... | 2,500 " " |
| To the (2,000) persons whose estimates are next closest ($10.00 each) ....................................... | 20,000 " " |
| To the (3,000) persons whose estimates are next closest ($5.00 each) ....................................... | 15,000 " " |
| To the 30,000 persons whose estimates are next closest we will send to each one box of 50 "Cremo" Cigars (value $2.50 per box) ....................................... | $ 7,000 |
| 35,213 persons ....................................... | $142,500 |

"Every 100 Bands from Above-Named Cigars Will Entitle You to Four Estimates.

"(One band from 'Florodora' Cigars or one band from 'Florodora Operas' counting as two bands from the other cigars mentioned; and no less that 100 bands will be received at any one time for estimates.)

"Information which may be of value in making estimates: The number of cigars now bearing $3.00 Tax per thousand, for which Stamps were purchased, appears below:

| | 1900. | 1901. | 1902. |
|---|---|---|---|
| January ...................... | 422,512.494 | 448,806,638 | 496,983,717 |
| February ...................... | 394,440,344 | 417,196,433 | 445,495,483 |
| March ...................... | 436,122,097 | 445,641,761 | 516,599,027 |
| April ...................... | 427,952,658 | 481,670,212 | 516,835,163 |
| May ...................... | 456,509,855 | 553,187,580 | 523,035,907 |
| June ...................... | 473,591,527 | 500,693,908 | 532,151,477 |
| July ...................... | 457,642,572 | 501,318,407 | 571,866,633 |
| August ...................... | 483,551,833 | 485,441,753 | 565,974,550 |
| September ...................... | 474,787,902 | 501,800,523 | 575,804,470 |
| October ...................... | 532,205,063 | 574,551,047 | 628,861,303 |
| November ...................... | 508,258,250 | 529,308,600 | 562,444,393 |
| December ...................... | 467,092,208 | 479,312,170 | |

"Only Cigar Bands are Good for Estimates. Send Nothing but Cigar Bands Under This Offer.

"In case of a tie in estimates, the amount offered will be divided equally among those entitled to it. Distribution of the awards will be made as soon after December 1st, 1903, as the figures are obtainable from the Internal Revenue Department of the United States for November, 1903.

"Write your full name and Post Office address plainly on packages containing bands. The postage or express charges on your package must be fully prepaid, in order for your estimate to participate.

"All estimates under this offer must be received on or before October 31st, 1903, by the         "Florodora Tag Company,

           "Jersey City, N. J.

"Send each estimate on a separate piece of paper with your name and address plainly written on each.

"You do not lose the value of your bands. Receipt will be sent you for your bands, and these receipts will be just as good as the bands themselves in se-curing Presents illustrated in our catalogue.

"Handsomely illustrated 80-page catalogue (page 7 in. x 10 in.) showing all the Presents exactly as they are, and with beautiful embossed cover litho-graphed in 10 colors and gold, will be mailed to any address upon receipt of 10 cents, or ten tags, or 20 cigar bands."

Argued before VAN BRUNT, P. J., and HATCH, PATTERSON, INGRAHAM, and LAUGHLIN, JJ.

Howard S. Gans, for appellant.
John W. Ingram, for respondent.

LAUGHLIN, J.   The question presented by this appeal is whether the relator, by this publication, advertised or published an account of a lottery.   Section 327 of the Penal Code declares that any person who "advertises or publishes an account of a lottery, whether within or without the state, stating how, when or where the same is to be, or has been, drawn, or what are the prizes therein, or any of them, or the price of a ticket, or any share or interest therein, or where or how it may be obtained, is guilty of a misdemeanor."   It has been sufficiently shown that the relator is responsible for the advertisement, and, if the article or notice published shows that the Florodora Tag Company is conducting a lottery, it is manifest that the publication contains a suf-ficient account of the lottery to render the relator liable.

The inquiry is thus narrowed to the question as to whether this is a lottery, and its solution depends upon the construction of section 323 of the Penal Code, which defines a lottery as follows:

"A lottery is a scheme for the distribution of money by chance, among persons who have paid or agreed to pay a valuable consideration for the chance, whether called a lottery, raffle, or gift enterprise or by some other name."

It is not disputed that this is a scheme for the distribution of property among persons who shall have paid a valuable consideration for the privilege of participating therein.   It is contended, however, by the relator, and this contention was sustained at Special Term, that the distribution is not to be made by chance, within the intent and meaning of this statutory definition of a lottery.   This, therefore, is the question presented for decision, and it is one of great public interest and im-portance.   It is manifestly impossible for any one to ascertain or know in advance the number of cigars in a given month upon which the government will attach revenue stamps of the denomination of $3 per thousand.   The period for presenting estimates closed on the last day of the month preceding that for which they were to be made, and obviously there are many other elements of chance that render it diffi-cult for any one to make any estimate that will approximate accuracy. It is claimed, however, that those making estimates have as a basis the information given as to the importations during each month for the years 1900, 1901, and 1902, and that they may be aided by acquiring knowledge of the condition of the tobacco trade, both as to supply and demand; and that those possessing the greatest knowledge will be able

to estimate more accurately than those without knowledge on the subject. This is undoubtedly true. It is claimed that it follows from the mere fact that those participating in the scheme may be able, by thus acquiring knowledge to aid their judgment, to estimate with a greater degree of accuracy than others, that this is not a distribution of the property and prize money by chance within the prohibition of the statute. If, as has been held in some jurisdictions, the drawings or distribution must depend exclusively on chance, and the chances of winning or being successful cannot be aided in the least by the exercise of judgment, then unquestionably the scheme which the relator has advertised would not constitute a lottery. No case is cited, and we find none, directly in point in this state, or controlling in principle.

In Reilly v. Gray, 77 Hun, 402, 28 N. Y. Supp. 811, which was an action to recover moneys bet on a horse race, it was held that pool-selling did not constitute a lottery within the meaning of section 323 of the Penal Code, and the ground of the decision was that selling pools on horse races was prohibited by statute prior to the incorporation in the Constitution of 1821 of the provision prohibiting the Legislature from authorizing lotteries and requiring it to enact laws to prevent the same, and that the legislation concerning pool-selling has been since classified with the legislation concerning gambling, and has been kept separate and distinct from the legislation concerning lotteries. In People ex rel. Lawrence v. Fallon, 152 N. Y. 12, 46 N. E. 296, 37 L. R. A. 227, 57 Am. St. Rep. 492, it was held that prizes offered by an association to the winners of horse races is not a lottery, the court adopting and following the reasoning of the court in Reilly v. Gray, supra; but the court made the following observations:

"That statute defines a lottery as a scheme for the distribution of property by chance among persons who pay or agree to pay a valuable consideration for the chance. It is obvious from the language of this statute, and the circumstances existing at the time of its passage, that it was not intended to include within its provisions every transaction which involved any degree of chance or uncertainty, but its plain purpose was to prohibit and punish certain well-known offenses which had existed and been regarded as crimes before the enactment of that law. The offenses thus sought to be suppressed have long been known and understood, and are clearly distinguishable from the racing of animals for stakes or prizes. There is certainly a great difference between a contest as to the speed of animals for prizes or premiums contributed by others and a mere lottery, where the controlling, and practically the only, element, is that of mere chance alone. A race or other contest is by no means a lottery simply because its result is uncertain, or because it may be affected by things unforeseen and accidental."

In People v. Gillson, 109 N. Y. 389, 17 N. E. 343, 4 Am. St. Rep. 465, it was held that a statute (section 335a, Pen. Code) making it a misdemeanor to induce the purchase of one commodity by giving a purchaser of a specified quantity other property was unconstitutional; but there each purchaser of the same quantity was given the same privilege, and there was no element of chance involved. In Hull v. Ruggles, 56 N. Y. 424, it was held that selling candy in packages, some but not all of which contained tickets calling for silverware as prizes, was a lottery; but this depended entirely upon chance. In Wilkinson v. Gill, 74 N. Y. 63, 30 Am. Rep. 264, it was held that "policy" is a lottery. In Horner v. United States, 147 U. S. 449, 13 Sup. Ct. 409, 37 L. Ed. 237,

it was held that a sale of bonds by the government of Austria, redeemable at a given time, but a certain number of which, to be selected by lot, were to be redeemable at figures far in excess of their par value as an inducement to purchasers, was a lottery within the federal statutes regulating the use of the mails, but the selection of the bonds that were to be redeemed for more than their face value was a matter solely of chance.   In Dion v. St. John Baptiste Society, 82 Me. 319, 19 Atl. 825, it was held that a scheme by which a charitable association offered a prize to the person in some profession, office, or occupation in whose name the most money was contributed thereafter was not a lottery; but, while this to some extent depended upon chance, yet it depended principally upon the popularity of the individual and the activity and interest displayed by him and his friends.· In Regina v. Dodds, 4 Ont. Rep. 390, where a statute prohibited the distribution of property by lots, cards, tickets, or any mode of chance whatever, it was held that a scheme by which the purchasers of merchandise were permitted to guess at the number of beans in a jar, the one guessing nearest to receive a prize, was a scheme for the disposition "solely by the exercise of skill and judgment," for the reason that the participants could figure and estimate with some degree of accuracy on the result.   In Regina v. Jamieson, 7 Ont. Rep. 149, it was held that offering a Shetland pony and cart to a person giving the most accurate estimate as to the number of buttons of different sizes in a half filled jar, those purchasing merchandise of the person offering the prize only being permitted to guess, was not a disposition of the property depending on chance. In Dunham v. St.·Croix Soap Mfg. Co., 34 New Brunswick, 243, where the public, without making purchases or paying for the opportunity, were permitted to estimate the weight of a large cake of soap for a prize, it was held that the result depended mainly on skill, experience, judgment, and calculation, and not exclusively on chance, and therefore it was not a lottery.   In Hall v. Cox (1899) L. R. 1 Q. B. 198, it was held that a prize offered for accurate prediction of the number of births and ·deaths in London during a specified week was not a lottery, and that, "to constitute a lottery, it must·be a matter depending entirely upon chance."   In Barclay v. Pierson (1893) L. R. 2 Ch. Div. 154, where an incomplete sentence was given, the final word being omitted, and persons, upon paying a shilling, were·permitted to guess the omitted word, which had been determined in advance, and was not necessarily the most appropriate word, it was held that this was a lottery, but that it would not have been had the most appropriate word been called for.   In Caminado v. Ulton (1891) 60 L. J. (Magistrate's Cases) 116, 121, it was held that giving prizes on coupons taken from a sporting paper for picking the winners at future horse races "was not obtaining money by a chance, or by anything analogous to chance." In United States v. Rosenblum, 121 Fed. 180, it was held by Thomas, J., sitting in the United States Circuit Court, that prizes to a person guessing the nearest to the number of cigarettes on which internal revenue tax would be paid during a given month was not a lottery within the prohibition of section 3894, Rev. St. U. S. [U. S. Comp. St. 1901, p. 2659], which is quite as broad as the provision of the Penal Code now under consideration.   In Hudelson v. The State, 94 Ind. 426, 48 Am.

Rep. 171, the purchasers of goods whose purchases amount to 50 cents were permitted to estimate the number of beans in a glass globe for a prize to be given to the person making the nearest estimate. It was held that this was a lottery, for the reason that, while a calculation might aid in making an estimate, it would only be approximate at most, and for all practical purposes the prize would be determined by chance. In State v. Nebraska Home Co. (Neb.) 92 N. W. 763, 60 L. R. A. 448, it was held that a scheme to produce a common fund to be distributed among shares to help pay for a home or the erection of buildings, which provided that the applications should be numbered in the order received, and that the shares should mature in the order of the numbers of the applications, was a lottery.

These are the only adjudicated cases to which our attention has been drawn, or which we have found, that have any direct bearing upon the question. While, therefore, there appears to be no decision in this jurisdiction in point on the question at bar, the weight of authority elsewhere seems to be in favor of confining the lottery statutes to cases where the disposition of money or other property rests exclusively upon chance. A retrospect of the constitutional and statutory provisions of this state leads to the conviction that such, also, should be the interpretation of section 323 of the Penal Code. Prior to 1813 both public and private lotteries were authorized and regulated by law in our state. By the Revised Laws of 1813 public lotteries were continued and regulated. 1 Rev. Laws 1813, p. 270. The Revised Laws also contained a provision prohibiting private lotteries (2 Rev. Laws 1813, p. 187), but contained a further provision apparently repealing this (Id. p. 556). By chapter 206, p. 258, of the Laws of 1819, private lotteries were absolutely prohibited, and public lotteries were regulated and restricted. Section 11 of article 7 of the Constitution of 1821 provided as follows: "No lottery shall hereafter be authorized in this state; and the Legislature shall pass laws to prevent the sale of all lottery tickets within this state, except in lotteries already provided for by law." Section 26, art. 4, c. 20, tit. 8, pt. 1, p. 665, of the Revised Statutes, as originally enacted, under the heading "Of Raffling and Lotteries," provided as follows: "Every lottery, game, or device of chance, in the nature of a lottery, by whatever name it may be called, other than such as have been authorized by law, shall be deemed unlawful, and a common and public nuisance." Section 27, art. 4, tit. 8, c. 20, pt. 1, p. 665, of the Revised Statutes, provided that "no person, unauthorized by special laws for that purpose, shall, within this state, open, set on foot, carry on, promote, or draw, publicly or privately, any lottery, game or device of chance of any nature or kind whatsoever, or by whatever name it may be called, for the purpose of exposing, setting to sale, or disposing of any houses, lands, tenements, or real estate, or any money, goods, or things in action," and declared any violation of this section to be a misdemeanor. Section 10 of article 1 of the Constitution of 1846 forbade the sale of lottery tickets, or the authorization of a lottery, within the state. The provisions of the Revised Statutes continued in force down to the enactment of the Penal Code in 1881. Section 9 of article 1 of the Constitution of 1894 provides as follows: "Nor shall any lottery or the sale of lottery tickets, pool selling, book-

making, or any other kind of gambling hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section." Prior to the Constitution of 1821 there were special statutory provisions prohibiting horse racing for stakes, and betting on horse races, and prohibiting "excessive and deceitful gaming." 1 Rev. Laws 1813, pp. 222, 152. However, after lotteries were prohibited, the Legislature from time to time extended the laws prohibiting betting on horse races and gambling. Chapter 504, p. 943, Laws 1851; chapter 178, p. 192, Laws 1877; Pen. Code, c. 9. In many of the forms of gaming and gambling prohibited by these statutory provisions the disposition of the property depended upon chance, and a valuable consideration was paid by the person entitled to participate therein; but the chance was, or was supposed to be, influenced more or less by the exercise of skill and judgment. It thus appears from the history of legislation that it was not understood by the Legislature, or intended, I think, that anything was prohibited by the lottery statute where, although the disposition of the money or property depended upon chance, such distribution could be influenced by the exercise of skill or judgment. Bearing in mind that for a long period both public and private lotteries were authorized in this state, and that, when prohibited, the Legislature employed language not materially different from that contained in section 323 of the Penal Code now under consideration, the true construction of this statutory provision is, I think, that it was intended to prohibit what were then known as lotteries pure and simple; that is to say, schemes for the distribution of money or other property exclusively, or practically exclusively, by chance. The Florodora Tag Company, which inserted this advertisement, is not conducting a lottery. It is apparent that it is engaged in the tobacco and cigar business. The advertisement has evidently been resorted to as a means of advertising the cigars in the sale of which the company is interested. It is evident that the price of its cigars is the same to those who preserve the wrappers and participate in the guessing contest as to those who do not. It furnishes its patrons sufficient information to afford them some basis for making an estimate upon which their right to the prizes will depend, and they may possess or acquire other information that will be of assistance.

It may be well for the Legislature to prohibit such forms of competition by declaring enterprises of this character to be unlawful, but it is evident that these methods resorted to in recent years by merchants and traders engaged in ruinous competition were not foreseen in the early days when lotteries were prohibited, and therefore their prohibition is not within the purview of the lottery statute. A penal statute should be so drafted that an honest business man may know whether or not he is offending against it. If the court should attempt to give a construction to the lottery statute by which dispositions of property depending not wholly upon chance would be included within its prohibition, there would be difficulty in the practical application of the law. If we should say that it is immaterial that skill or judgment may influence the determination if the disposition of the property still is mainly controlled by chance, how could a business man determine that question with safety? He might be of opinion that the disposition of the

property depended mainly upon the exercise of skill or judgment, and be innocent of any wrongdoing; but a jury might determine that its disposition depended mainly upon chance, which would make him a criminal before the law. These considerations lead to the conclusion that the relator has not advertised a lottery, and that he was properly discharged.

It follows, therefore, that the order should be affirmed.

PATTERSON and HATCH, JJ., concur. VAN BRUNT, P. J., and INGRAHAM, J., dissent.