STATE of Indiana, Appellant,

Hoosier Horse Industries, Inc. (Intervening Defendant) Appellant,

v.

Joseph H. NIXON, Appellee.

No. 378S44.

Supreme Court of Indiana.

Jan. 5, 1979.

Theodore L. Sendak, Atty. Gen., Donald P. Bogard, Deputy Atty. Gen., Chief Counsel, Ronald J. Semler, Deputy Atty. Gen., Indianapolis, for appellant State of Indiana.

Henry J. Price, James A. Strain, Donald E. Knebel, Indianapolis, for appellant Hoosier Horse Industries, Inc.

David F. McNamar, Michael R. Franceschini, Indianapolis, Robert M. Gholston, Franklin, for appellee.

PRENTICE, Justice.

This is an appeal from a judgment granting injunctive relief and determining the constitutionality of 1977 Indiana Acts Public Law 47 (March 25, 1977), hereinafter referred to as the Pari-Mutuel Wagering Act.

The Indiana General Assembly enacted Public Law 47 over the veto of the Governor. The Act permits pari-mutuel wagering upon horse races and harness races under conditions contained in the Act, and establishes the Indiana Racing Commission to regulate racing and pari-mutuel betting. Under it, the Governor is empowered to appoint and remove this Commission's members. The Act provides for the licensing of persons and organizations to conduct racing with pari-mutuel betting, and provides that pari-mutuel race track betting shall be permitted only in those Indiana counties which authorize such betting by ordinance approved in a county-wide referendum. The Act empowers the Governor to appoint and remove the Commission's mem-

bers, provides the manner in which the pari-mutuel betting operates and requires payment of a tax by the racetrack on its share ("retainage") of the bets to the State and County treasuries. Ind.Code §§ 4–25–1–1 to 4–25–6–15 (Burns 1977); Ind.Code §§ 35–45–5–5, 35–31–2–7 (Burns 1977).

Nixon, the plaintiff (appellee), sought a declaratory judgment that the Pari-Mutuel Wagering Act was unconstitutional and an injunction forbidding the Governor from appointing members to the Indiana Racing Commission, as required by the Act.[1] The named defendants were the State of Indiana and the Honorable Otis R. Bowen, Governor of Indiana, ("State"). Hoosier Horse Industries, Inc., ("Hoosier Horse") a corporation desiring to conduct racetrack pari-mutuel betting, intervened as a defendant. The Johnson Circuit Court, after hearing evidence, found the Act to be unconstitutional upon several grounds and issued the requested injunctive and declaratory relief. The State and Hoosier Horse have appealed to this Court pursuant to Ind.R.App.P. 4(A)(8) which is applicable because a statute of this State has been declared unconstitutional.

## I.

Nixon argues that this appeal is moot because of a failure of appellants to include the Governor of Indiana as a nominal party to the appeal. In this regard the State's brief expressly states that the Governor is not a party to the appeal. Nixon's argument and the State's assertion are incorrect. Indiana R.App.P. 2(B) provides that "All parties of record in the trial court *shall be* parties on appeal." (Emphasis added.) The rule operates of its own force to make all parties in the trial court parties on appeal, whether such parties participate actively or not. Therefore the asserted mootness, the immunity of the injunction against the Governor from review, does not exist.

1. Since the Act permits pari-mutuel betting to be conducted only by licensees of the Commission, an injunction against appointment of members thereto effectively frustrates implementation of the Act as a whole.

*City of Indianapolis v. Indiana State Board of Tax Commissioners,* (1974) 261 Ind. 635, 308 N.E.2d 868, relied upon by Nixon, does not reconstruct the old rules of necessary and indispensable parties. In *City of Indianapolis* the *only* appellant was the city, which lacked standing. Therefore no proper complainant sought to invoke the jurisdiction of this Court, and there was consequently no "case or controversy" to be adjudicated. 261 Ind. at 638, 308 N.E.2d at 869. In this case the State is not alleged to lack standing as a party. The appeal is not moot.

## II.

The Act defines the "pari-mutuel system of wagering" as follows:

"'Pari-mutuel system of wagering' means the method or system or wagering on horses at the track only under which those persons who wager on horses, which finish in the position or positions for which wagers are taken, share in the total amount wagered, less deductions specified and permitted by law." Ind. Code § 4–25–1–10 (Burns 1977 Supp.).

The evidence as to the operation of the betting is not in dispute. Bettors make their bets by purchasing tickets in the amount they wish to risk. Bettors bet that a given horse will "win" (finish in first place), "place" (finish in first or second place), or "show" (finish in first, second, or third place) by purchasing the appropriate ticket. All money bet to win is placed in the "win pool," to place in the "place pool," and to show in the "show pool." The licensed pari-mutuel operator is authorized by the Act to retain 17% of each pool, Ind.Code § 4–25–4–3, from which he pays special taxes, and the operator and the State split the "breaks," fractional amounts left over after calculation of winnings to the nearest ten cents. The pools are distributed to bettors holding winning tickets as follows:

"(a) Win pool:

(1) Win tickets sold on all horses entered in a race, times the ticket prices = the gross win pool.

(2) Gross win pool, less 17% retainage = the net win pool.

(3) The net win pool, divided by the number of tickets sold on the winning horse = the gross payoff.

(4) Gross payoff, less breakage (if any) = payoff to a bettor holding a winning win ticket.

(b) Place pool:

(1) Place tickets sold on all horses entered in a race, times the ticket price = the gross place pool.

(2) The gross place pool, less 17% retainage, less the price of place tickets sold on the winning horse to place and place tickets sold on the place horse = the net place pool.

(3) The net place pool, divided by 2 (the win and the place horses) = the net place pool for the win and place horses.

(4) The net place pool for the winning horse, divided by the equivalent number of $2.00 place tickets sold on the winning horse = the place payoff for the equivalent number of $2.00 tickets before adding the price of the ticket purchased, less breakage (if any).

(5) The net place pool for the place horse, divided by the equivalent number of $2.00 place tickets sold on the place horse = place payoff for the equivalent number of $2.00 tickets before adding the price of the ticket purchased, less breakage, (if any).

(6) To the amounts determined in 4 and 5 add the price of the ticket purchased, less breakage (if any) = payoff to a bettor holding a winning place ticket.

(c) Show pool:

(1) Show tickets sold on all horses entered in a race, times the ticket price = the gross show pool.

(2) The gross show pool, less 17% retainage, less the price of tickets sold on the win, place, and show horses = the net show pool.

(3) The net show pool, divided by 3 (the win, place, and show horses) = the net show pool for each of the win, place and show horses.

(4) The net show pool for the winning horse, divided by the equivalent number of $2.00 show tickets sold on the winner = show payoff for the equivalent number of $2.00 tickets on the winning horse before adding the price of the ticket, less breakage (if any).

(5) The net show pool for the place horse, divided by the equivalent number of $2.00 show tickets sold on the winning place horse = show payoff for the equivalent number of $2.00 tickets on the place horse before adding the price of the ticket, less breakage (if any).

(6) The net show pool for the show horse, divided by the equivalent number of $2.00 show tickets sold on the winning show horse = show payoff for the equivalent number of $2.00 tickets on the show horse before adding the price of the ticket, less breakage (if any).

(7) To the amounts determined in 4 and 5 and 6, add the price of the ticket purchased, less breakage (if any) = payoff to a bettor holding a winning show ticket." Finding of Fact No. 10.

The Act provides that a winning bettor can never recover less than the amount of his bet plus ten cents, Ind.Code § 4–25–4–5. The "odds" on each horse (return on amount of bet) are thus determined by the distribution of the bets. The Act provides that each pari-mutuel racetrack must maintain a sign displaying approximate odds as they develop during the period before the race when the ticket windows are open. Ind.Code § 4–25–4–5.

Witnesses testified that numerous factors enter into the outcome of the race itself, including the speed and endurance of each horse, the weight and ability of each jockey, the condition of the track and the length of the course. These factors can be assessed from the record of past success of horses and riders, knowledge of the genealogy and training of the horses, and observation of the horses and track before the race. The necessary documentary information can be obtained from "racing forms" of general circulation or from racetrack programs.

Based upon the provisions of the Act and this evidence, the trial court held that pari-mutuel wagering constituted a lottery within the meaning of the following provisions of our Constitution: "No lottery shall be authorized; nor shall the sale of lottery tickets be allowed." Indiana Constitution Article 15, § 8.

Appellants dispute this conclusion as contrary to law. Inasmuch as the Legislature is presumed to have concluded that pari-mutuel wagering was not a lottery, it was the burden of Nixon in the trial court to establish clearly that such wagering was within the constitutional prohibition. *Reilly v. Robertson*, (1977) Ind., 360 N.E.2d 171, 175. On appeal this Court presumes the correctness of the judgment of the court below, but this presumption will not remedy any deficiencies in Nixon's showing of unconstitutionality.

In *Tinder v. Music Operating, Inc.*, (1957) 237 Ind. 33, 40, 142 N.E.2d 610, 614, heavily relied upon by Defendant and Intervening Defendant, we said:

"What is lottery? The Courts of Indiana have placed no other interpretation on the word 'lottery' than its commonly accepted meaning, defined in Webster's New International Dictionary, as follows: 'A scheme for the distribution of prizes by lot or chance; esp., a scheme by which one or more prizes are distributed by chance among persons who have paid or promised a consideration for a chance to win them, * * * A game in which prizes are given from a pool to holders of cards matching others reserved for that purpose.' Lotteries are a species of gaming, and, although lotteries are gambling, not all forms of gaming or gambling are lotteries."

It is our opinion that the foregoing statement from the *Tinder* case need not and

should not control our decision in the case before us. It was there held that in the operation of the machine in question, skill was a predominant factor, thereby removing it from the concept of a lottery, as above defined. We cannot say the same for pari-mutuel play, however, which falls into the category of a lottery, both under the literal definition of *Tinder* and under the broader constitutional concept which we recognize today.

Unquestionably, as ably argued, picking horses for speed and endurance requires considerable skill and study, and under the literal definition, mere wagering upon the outcome of a horse race would not be a lottery. Under the pari-mutuel system, however, the players are not so wagering. Rather, they are wagering upon the outcome of the race in combination with what the wagers of other players will be—both as to selection of horses and amounts wagered. Players can control their own bets, but they cannot control or logically calculate what the selections of others will be or what amounts they will bet. Yet, these are dominant factors in the results of the play. To some extent one may estimate the odds at the time he places his bet; but at that point such ability passes from his control and becomes entirely dependent upon what subsequent players do. Although not commonplace, neither is it a rarity for a winning horse to pay a higher percentage return to place or show bettors than to those who bet it to win.

It is clear that the element of luck in guessing the odds outweighs the element of skill in predicting the outcome of the race. Were it otherwise, the game could not survive, because it follows that the skilled could and would parlay their winnings until their bets eclipsed those of the unskilled and semi-skilled and soon would have all of the money.

Be that as it may, we have determined that the *Tinder* case, although correctly decided, upon its facts, is not determinative of this case. Although we have in other cases accepted the aforestated literal definition of "lottery," which embodies chance as a prime

element, we are not bound to accept a definition applied at another time and for another purpose as definitive of the constitutional intent of 1851.

Although many rules of statutory construction are equally applicable to constitutional construction, we do not apply them with as much rigidity. The objective of both is to arrive at the intent; but constitutional objectives are customarily broad and general, whereas statutory objectives tend to be narrow and specific.

In *Ellingham v. Dye,* (1912) 178 Ind. 336, 379, 99 N.E. 1, 16, we said:

"It would not be practicable, if possible, in a written constitution, to specify in detail all its objects and purposes, or the means by which they are to be carried into effect. Such prolixity in a code designed as a frame of government has never been considered necessary nor desirable. Therefore, constitutional powers are often granted or restrained in general terms, from which implied powers and restraints may necessarily arise."

It is well settled that constitutions are to be liberally construed, giving to their provisions a construction that is broader than that given to statutes, since the powers and restraints dealt with in constitutions are unlimited. Constitutions are the basic foundation upon which our statutes are constructed. They are expected to operate over a longer period of time; and the methods of revision are much more cumbersome than in the case of statutes. In consequence, constitutions, if they are to serve their intended purpose, cannot be construed with the strictness of statutes or contracts, although many rules of construction are applicable to all three. It has often been said that constitutions are "living documents." This, in our view, is not to say that they are to be disregarded or altered at the whim of judges but rather " * * * the constitution is primarily a set of principles and not rules." *Integration of Bar Case,* (1943) 244 Wis. 8, 11 N.W.2d 604, 621.

In *Bain Peanut Co. et al. v. Pinson et al.,* (1931) 282 U.S. 499, 51 S.Ct. 228, 75 L.Ed. 482, Mr. Justice Holmes said: "The inter-

pretation of constitutional principles must not be too literal." and in *United States v. Lefkowitz,* (1932) 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877, 82 A.L.R. 775, it was written that the principles, rather than the direct operation or literal meaning of the words used, measure the purpose and scope of the constitution.

"The provisions of the constitution must receive a liberal, practical common-sense construction and new provisions must be considered with reference to the situation intended to be remedied or provided for." *McMillan v. Siemon,* (1940) 36 Cal.App.2d 721, 98 P.2d 790, Cal. 4th Dist. Court of Appeals,

"The provisions of the constitution, or of a statute should receive a practical rather than a technical, construction, * * * one leading to a wise policy rather than of 'mischief or absurdity.' * * * " *California Employment Stabilization Commission v. Municipal Court, etc.,* (1944) Calif. Court of Appeals 1st Dist., 62 Cal.App.2d 781, 145 P.2d 361; *Unemployment Reserve Commission v. St. Francis Homes Association,* (1943) Calif. Court of Appeals, 1st Dist., 58 Cal.App.2d 271, 137 P.2d 64.

"It has been very appropriately stated that the pole-star in the construction of [the] constitutions is the intention of the makers and adopters.

"Wherever the purpose of the framers of a constitution is clearly expressed, it will be followed by the courts. Even where terms of a constitutional provision are not entirely free from doubt, they must be interpreted as nearly as possible in [consonant] with the objects and purposes in contemplation at the time of their adoption, because in construing a constitutional provision, *its general scope and object should be considered.*" (Emphasis added). *State ex rel. Jones v. Lockhart,* (1953) 76 Ariz. 390, 265 P.2d 447.

"The primary object in construction is to ascertain the 'common understanding' as to the meaning of any provision entertained by 'both those who framed and those who ratified' it * * *. If there be any doubt concerning any constitution-

al provision, 'the court should also look to the nature and objects of the particular powers, duties and rights in question, with all the light and aids of contemporary history, and *give to the words of each provision just such operation and force, consistent with the legitimate meaning, as will fairly secure the end proposed.'* " (Emphasis added). *Kirkpatrick v. King,* (1949) 228 Ind. 236, 91 N.E.2d 785 and cases there cited.

"It is settled by very high authority, that in placing a construction upon a constitution or any clause or part thereof, the court should look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, *to ascertain the old law, the mischief, and the remedy.*" (Emphasis added). *State v. Gibson,* (1871) 36 Ind. 389, 391.

"In order to properly determine the meaning of the said § 1 of Art. 3, *we should consider the purpose which induced its adoption.*" (Emphasis added). *State ex rel. Black v. Burch,* (1948) 226 Ind. 445, 457, 80 N.E.2d 294, 299.

"In construing and giving an interpretation to the Constitution, we must take into consideration the situation as it existed at the time of its adoption." *State ex rel. Holt, et al. v. Denny, Mayor, et al.,* (1888) 118 Ind. 449, 458, 21 N.E. 274, 277.

It has been said that it is the spirit which vivifies and the letter which killeth. *Downes v. Bidwell,* (1901) 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088.

Utilizing the liberal approach to constitutional construction and the conviction that the fundamental principle of such construction is to give effect to the intent of those who framed and adopted the organic law, the following are some of the very practical results that have been reached by the courts, including our own.

In *Board of Election Commissioners, etc. v. Knight,* (1917) 187 Ind. 108, 117 N.E. 565, it was held that the word "appointment," as used in Article XV, Section 1 of our State Constitution meant "method of selection,"

relying upon *McPherson v. Blacker,* (1882) 146 U.S. 1, 27, 13 S.Ct. 3, 36 L.Ed. 869, where it was said that although the word "appoint" is not the most appropriate word to describe the result of a popular election, it was sufficiently comprehensive to cover that mode and was manifestly used as conveying the broadest power of determination.

In *Hively v. School City of Nappanee,* (1929) 202 Ind. 28, 169 N.E. 51, it was held that "indebtedness," within the meaning of that word as used in Article XIII of the State Constitution, was created by an arrangement whereby a municipal corporation, although not legally bound to pay, would be required to pay or lose the property.

In *Spickerman, et al. v. Goddard,* (1914) 182 Ind. 523, 107 N.E. 2, looking to the purpose of the constitutional provision, we upheld the constitutionality of the use of voting machines over the contention that in 1851, when the Constitution was adopted, the meaning of the word "ballot" was plain, well understood and meant "a printed or written expression of the voter's choice, * * *." We there said:

"The purpose of the framers of a constitutional provision must be sought, and given effect, if found. Our organic law was framed to better secure to the people of the State their right to life, liberty and the enjoyment of the fruits of their industry. It was designed for the use of common practical people while pursuing their varied occupations, and not as a rigid mold to fetter their growth and development. It was written by statesmen, selected for their wisdom, while in convention assembled, and was designed for practical use rather than as a declaration of abstract principles. *In seeking its purposes, it must be viewed from the standpoint of the statesmen who formulated it, rather than that of lexicographers and philologists who neither participated in the work nor considered its provisions.* Story, Constitution §§ 400, 454; *Moore-Mansfield, etc., Co. v. Indianapolis, etc., R. Co.* (1913), 179 Ind. 356, 101 N.E.

296, 44 L.R.A.(N.S.) 816; *Elwell v. Comstock* (1906), 99 Minn. 261, 109 N.W. 113, 698, 7 L.R.A.(N.S.) 621, 9 Ann.Cas. 270; *Detroit v. Board, etc.* (1905), 139 Mich. 548, 102 N.W. 1029, 111 Am.St. 430, 69 L.R.A. 184, 5 Ann.Cas. 861. It is important that the end sought by the framers of this constitutional provision be not confounded with the means adapted to secure it. *The object the framers had in view was secrecy* in the people's choosing of officers or measures, and publicity in choosing by the members of the General Assembly. *Williams v. Stein* (1871), 38 Ind. 89, 10 Am.Rep. 97. Voting by ballot involves secrecy while *viva voce* voting insures publicity. The word 'ballot' was used as a symbol of secrecy while *viva voce* was used as the symbol of publicity. There was nothing sacred in the contrivance of a strip of paper with names or questions printed thereon, which the framers sought, to preserve by the use of the word 'ballot'; nor was there any imperative necessity for the use of the voice of the legislator which moved the convention to decree its perpetual exercise in legislative elections. The constitutional limitation is not violated by dispensing with the use of the paper contrivance in the one case, or the legislator's natural voice in the other, if, in the former the people may choose in secret, and in the latter the legislator must make a public expression of his choice. *Williams v. Stein, supra.* It can scarcely be doubted, unless resort be had to technical quibbles, that the constitutional mandate would be satisfied by the legislator publicly raising his right hand to express his choice in a legislative election, instead of using his voice for such purpose." 182 Ind. at 525, 526, 527, 107 N.E. at 3. (Emphasis added).

The Court of Appeals of Kentucky in *Meredith, Attorney General v. Kauffman,* (1943) 293 Ky. 395, 169 S.W.2d 37, departed from a literal application of a constitutional provision that "no Senator or Representative shall, during the term for which he was elected, nor for one year thereafter, be appointed or elected to any civil office of

profit in this commonwealth, which shall have been *created* * * * during the said term * * *." (Emphasis added).

The Kentucky court there held that the obvious purpose behind the constitutional provision was to exclude persons from office who were concerned in its creation and to minimize improper bias in the vote of the representatives. The court said:

> "*The Constitution is concerned with the substance and not with the form and its framers did not intend to forbid a common sense application of its provisions.* "Under a common sense application of the provision in question appellee is not ineligible to hold the office since he neither voted nor had the opportunity to vote on the act creating the office and was not a member of the General Assembly until its function in the creation of the office had been fully performed." (Emphasis added).

The Supreme Judicial Court of Massachusetts held that a constitutional provision that judges should be "retired" upon attaining the age of seventy years, did not render unconstitutional a statute providing for the re-call, for temporary or restricted duty, of judges so retired. The court said:

> "If possible, the amendment must be construed so as to accomplish a *reasonable result,* and to achieve its *dominating purpose.* Its words should be interpreted in the sense most obvious to the *common intelligence,* because a matter proposed for public adoption must be understood by all entitled to vote." (Emphasis added).

The majority of courts from other states that have considered this question under constitutional provisions like or similar to our own have held pari-mutuel gambling not to be proscribed. However, there is no particular logic disclosed in their opinions. All of such cases appear to be but rationalizations toward a pre-determined result by placing a literal interpretation upon the word "lottery," those courts have foreclosed a *practical, common sense inquiry as to purpose* and have contented themselves with considerations of whether winners of lotteries, as that term is generally employed, need be determined "solely" by chance or may be determined "predominately" by chance or even "substantially" by chance. Such considerations may be of technical and academic interests but are of little practical value in determining what the state's policy was to be in regard to enterprises in which the consumers, as a group, have no chance.

Demonstrative of the lack of logic employed in some of the opinions upon the issue are the following excerpts:

> "While an element of chance no doubt enters into horse and dog races, it does not control them." *Ginsberg v. Centennial Turf Club,* (1952) 126 Colo. 471, 251 P.2d 926.

The court obviously was reflecting upon the prospects of selecting the winner of a race rather than upon the prospects of winning in pari-mutuel play.

The Court of Appeals of Illinois in *People v. Monroe,* (1932) 349 Ill. 270, 182 N.E. 439, said that persons among whom the pari-mutuel purse was to be divided are not uncertain, as they are "those who bet on the winning horse." Are not the winners in a classical lottery just as certainly those who hold the tickets drawn?

The court proceeded to compare the pari-mutuel bettor to a salesman paid on commission, saying that both were "dependent in some degree on chance, * * *." One is compelled to wonder, from that analogy, how long the salesman would survive if his function were to sell and re-sell the same item repeatedly between the same two persons. *Clearly this is the service rendered by pari-mutuel systems, to provide a speculative event and to serve as "stake-holder" while the money, diminished by the commission, is passed around among the same players.*

In *Utah State Fair Association v. Green,* (1926) 68 Utah 251, 249 P. 1016, the court said: "It is not an element of chance as to the amount he may lose but only as to the amount he may win." We are unable to discern how the pari-mutuel differs in this

regard from the classical lottery—the price of the lottery ticket being known.

Of all the courts upholding the constitutionality of pari-mutuel statutes in the face of anti-lottery constitutional provisions, Kentucky alone has at least been candid, if not altogether legalistic. The Court of Appeals of that state, writing in 1931, after observing that it had not previously occurred to anyone that betting on races, elections or similar forms of wagering constituted a lottery, proceeded to say: "Indeed, the contention that betting on horse races by the pari-mutuel system constitutes a lottery is of recent origin in this state. For nearly half a century the General Assembly and the Court of Appeals have proceeded upon the general understanding that the whole subject of betting and gaming was within the power of the Legislature to prohibit, regulate or classify, prohibiting in part and permitting in part, according to its view of the public policy to be enforced. *Upon the faith of such legislation and decisions, large investments have been made, and, although the Legislature may radically change the law, without regard to the consequences on a particular business,*  \*  \*  \* *it is a doctrine of almost universal acceptance that the courts will not, under such circumstances, overturn a long line of decisions.*" (Emphasis added). *Commonwealth v. Kentucky Jockey Club*, 238 Ky. 739, 38 S.W.2d 987.

We are fortunate in that we may judge the statute in question without the frustration, doubtlessly encountered by the Kentucky court, as to what would be the impact of illegitimatizing an on-going major industry and eliminating a source of substantial state revenue.

There is no disagreement concerning the historical development of lotteries, as generally conducted in the early eighteen hundreds. Neither is there any question but that they were then held in infinitely lower esteem than other forms of gaming, such as betting upon horse races, election contests or even card games. Accordingly, they were treated differently under the laws— the lotteries the most harshly, because they were the most pernicious. The following brief paragraph from an 1850 unanimous opinion of the Supreme Court of the United States aptly sums up the viewpoint of learned men, at that time, concerning both the effects of gambling upon the welfare of the people and the obligation of governments—the "mischief" and the "remedy."

"The suppression of nuisances injurious to public health or morality is among the most important duties of government. Experience has shown that the common forms of gambling are comparatively innocuous when placed in contrast with the widespread pestilence of lotteries. The former are confined to a few persons and places, but the lottery infests the whole community; it enters every dwelling; it reaches every class; it preys upon the hard earnings of the poor; it plunders the ignorant and simple." *Phalen v. Commonwealth of Virginia*, (1850) 8 Howard 163, 12 L.Ed. 1030 at 1033.

Defendant and Intervening Defendants contend that the "mischief" of 1851 was lotteries, as then known and conducted, i. e. numbers drawn at random to determine who, among the purchasers of chances, was to win the prizes. However, we are of the opinion that the "mischief" was commercialized gambling that, as was said in *Phalen v. Commonwealth, supra*, "infests the community," "preys" upon the poor and "plunders" the "ignorant and simple," and that lotteries were but the form that such mischief took at that time and had for many years theretofore. *Lotteries, thus, were the symbol of commercial gambling enterprises.*

To dream of riches unearned and the willingness to gamble to achieve them appear to be inherent in the nature of man. The mischief flowing from these qualities, when man is left to his own devices, is relatively innocuous. But it becomes an injurious nuisance, a "pestilence," when capitalized upon by those who do not gamble or play the game at all but make an unconscionably profitable business of providing the temptation, lure of profits that are out of all proportion to the investment,

labor and skill involved, to the weak and unwary. These businesses operate by taking a percentage of all moneys gambled on the event and by paying to the winners only the remaining portion, or by formulating the game so that the mathematical odds are in their favor, or by a combination of the two. Under either system, all that is required is a sufficient volume of play, and no player can win; while the operators cannot but profit. The profits, in turn, are available to promote and advertise for more play and so on, ad infinitum.

It is obvious that lotteries, in the traditional sense, were just such commercial ventures, where the operators for a percentage of the wagers, promoted and provided a game of chance in which the players, as a class, could not win and the operators could not but profit.

The Supreme Court of Nebraska, in *State ex rel. Sorensen v. Ak-Sar-Ben Exposition Co.*, (1929) 118 Neb. 851, 226 N.W. 705, declared that the pari-mutuel system of betting and gambling on horse races contained every element of a criminal lottery, consideration, chance, prize, and means of disbursement. It articulated the mischief in the following words:

"Gambling is in the same category. It attracts young and old to places of idleness, where valuable time and fruits of honest endeavor are lost. It deprives legitimate industry of profitable service and lessens individual regards therefor. The lure of profits that are out of all proportion to investment or service impairs the initiative essential to the highest development of ideal citizenship. It tends toward crime and increases the burden of law enforcement—burdens that fall on the people generally throughout the state."

■■ Given the foregoing, we conclude that the concern of those who drafted and adopted our Constitution, including Article XV, section 8, was to minimize the harmful effects of gambling by sheltering the people from gaming enterprises promoted and operated for monetary gain by those who, because of the methods employed, are, in essence, *purveyors rather than players. The pari-mutuel system is a purveying of a gaming enterprise which, because of the retainage of a percentage of all wagers, precludes the players, in sustained play, from winning while providing a reasonable assurance of a profit to the operators.* In our judgment, and notwithstanding that a degree of skill is involved in selecting the horses most likely to perform well, the unpredictability of the odds to be paid and the limited predictability of the performance of the animals combine to provide the degree of "chance" required to meet the traditional textbook definitions of the term "lottery." However, whether or not it is a lottery, in the classical sense, is immaterial. *Its effects are precisely those sought to be prevented by Article XV, section 8; and, it is, therefore, a "lottery" within the meaning of that term as therein employed.*

As stated in *Hovey, Governor v. State ex rel. Riley*, (1889) 119 Ind. 386 at 388, 21 N.E. 890, at 890:

"We are far from asserting that the plain provisions of the Constitution may be broken down or overleaped by practical exposition, but what we do assert is, that where, as here, there are provisions not entirely clear and free from doubt, practical exposition is of controlling force."

Applying the word "lottery" in its literal sense would serve to proscribe but one form of commercialized gambling, while leaving those whom the proscription sought to protect exposed to the same mischief by methods identical in substance and different in form only. That such was the constitutional intent does not comport with common sense. When we put ourselves, as nearly as possible, in the position of those who framed and adopted our Constitution, we conclude that Article XV, section 8 was intended to proscribe the mischief occasioned by the lotteries, not merely the lotteries, and that the word "lottery" as used therein, embraces all forms of gaming which, by reason of retainage, service charge, or odds, preclude the participants, in sustained play, from winning while providing a reasonable expectancy of profit for the sponsors.

Whether or not state regulated pari-mutuel gaming is, under today's standards, an evil that needs to be protected against is a matter beyond the authority and concern of this Court. The majority of the legislators, in adopting a statute obviously believed that it is not. It is altogether possible that, if those who drafted and adopted the proscription under consideration were to reconsider the matter in the light of today's vastly changed society, they would view it differently. It is apparent to us, however, that in 1851 pari-mutuel gambling would have been regarded as a mischief of the class sought to be eliminated. The determination that the need for such protection no longer continues can be made only by those who have the authority, the people of Indiana acting by referendum upon a proposed constitutional amendment.

The Act is unconstitutional. The judgment of the trial court is affirmed.

GIVAN, C. J., and PIVARNIK, J., concur.

DeBRULER, J., dissents with opinion in which HUNTER, J., concurs.

HUNTER, J., dissents with opinion in which DeBRULER, J., concurs.

DeBRULER, Justice, dissenting.

The trail is clearly marked in this case by prior Indiana cases, historical considerations, and the case law of other jurisdictions; and it leads to the conclusion that pari-mutuel wagering on the outcome of horse racing does not constitute a lottery within the prohibition of Article 15, § 8, of the Indiana Constitution. The question presented is not a new one. The courts of thirteen jurisdictions have reached the conclusion that such betting, while certainly a form of gambling, does not constitute a lottery within constitutional or statutory prohibitions. *Opinion of the Justices*, (1971) 287 Ala. 334, 251 So.2d 751; *Oneida County Fair Board v. Smylie*, (1963) 86 Idaho 341, 386 P.2d 374; *Gandolfo v. Louisiana State Racing Comm.*, (1954) 227 La. 45, 78 So.2d 504; *Ginsberg v. Centennial Turf Club*, (1952) 126 Colo. 471, 251 P.2d 926; *Long-*

*streth v. Cook*, (1949) 215 Ark. 72, 220 S.W.2d 433; *Rohan v. Detroit Racing Assoc.*, (1945) 314 Mich. 326, 22 N.W.2d 433; *People v. Postma*, (1945) 69 Cal.App.2d Supp. 814, 160 P.2d 221; *Engle v. State*, (1939) 53 Ariz. 458, 90 P.2d 988; *People v. Monroe*, (1932) 349 Ill. 270, 182 N.E. 439; *Multnomah County Fair Assoc. v. Langley*, (1932) 140 Or. 172, 13 P.2d 354; *Commonwealth v. Kentucky Jockey Club*, (1931) 238 Ky. 739, 38 S.W.2d 987; *Utah State Fair Assoc. v. Green*, (1926) 68 Utah 251, 249 P. 1016; *Reilly v. Gray*, (Sup.Ct.1894) 77 Hun. 402, 28 N.Y.S. 811; Courts in two jurisdictions have held that such wagering to constitute a lottery. *State ex rel. Moore v. Bissing*, (1955) 178 Kan. 111, 283 P.2d 418; *State ex rel. Sorensen v. Ak-Sar-Ben Exposition Co.*, (1929) 118 Neb. 851, 226 N.W. 705.

The grounds upon which these cases have been decided have varied. Needless to say, it is the weight of reason and not the weight of numbers which must govern our decision. Nonetheless our task is facilitated by the abundance of reasoning available for our consultation.

Hoosier Horse has undertaken an extensive historical analysis of the development of constitutional prohibitions against lotteries with the purpose of demonstrating that the framers of our constitutional provision did not contemplate the prohibition of betting on races. Lotteries were first made illegal by statute in 1832. Acts 1832, ch. CLXXIX at 269, Laws of the State of Indiana, 16th Session of the General Assembly, Indianapolis: Douglas & Maguire (1832). In 1850 the Indiana Convention voted 41–27 to insert the ban against lotteries in the Constitution, Report of the Debate and Proceedings of the convention for the revision of the Constitution (Indianapolis, 1850), II, 1286, 1294, 2076. During the colonial period in America wide use had been made of the lottery by both governments and private persons to raise money. During the 19th Century opposition to lotteries grew in this country. The anti-lottery forces contended that the lottery was bad because it encouraged mass gambling and that drawings

were fraudulent and on occasion never did take place. Encyclopedia Brittanica 1977, Lottery, V. 22, p. 113. Lotteries sanctioned or operated by the government or private persons during the period followed a common pattern. The sale of lottery tickets, the prizes to be offered, and the use to which the retainage was to be put by the operators, received wide publicity in the community in which the lottery was to be held. Each lottery ticket sold was designated by a number. Numbers were randomly selected at a drawing and the winners were thereby determined. Such schemes were conducted so as to minimize to the utmost the ability of the operators to effect, and the players to predict the outcome. To be sure lottery schemes differed, however, the thought prevalent in the middle of the last century distinguished between and separately identified gambling enterprises conducted as lotteries and other forms of gambling. The definition of a lottery announced by this Court in *Tinder v. Music Operating, Inc.*, (1957) 237 Ind. 33, 40, 142 N.E.2d 610, 614, is consonant with this historical overview of the lottery. There we said:

> "What is lottery? The courts of Indiana have placed no other interpretation on the word 'lottery' than its commonly accepted meaning, defined in Webster's New International Dictionary, as follows: 'A scheme for the distribution of prizes by lot or chance; esp., a scheme by which one or more prizes are distributed by chance among persons who have paid or promised a consideration for a chance to win them, * * * A game in which prizes are given from a pool to holders of cards matching others reserved for that purpose.' Lotteries are a species of gaming, and, although lotteries are gambling, not all forms of gaming or gambling are lotteries."

As can be seen history provides strong support for the conclusion that the framers of the Indiana Constitution did not mean to encompass pari-mutuel wagering on horse racing within their prohibition of lotteries.

An analysis proceeding from universally accepted criteria of a "lottery" leads to the same result. Courts everywhere, construing both constitutional and statutory lottery prohibitions, agree that a lottery is characterized by three elements: consideration (paid for a chance to win); prize (awarded to winner); and chance (in determination of winner). *Tinder v. Music Operating, Inc., supra,* and cases cited at 237 Ind. 40, 142 N.E.2d 615; *Williams v. Weber Mesa Ditch Extension Co.,* (Wyo.1977) 572 P.2d 412; *Morrow v. State,* (Alaska 1973) 511 P.2d 127, and cases cited at 129; *People v. Postma, supra.* There is some disagreement among the courts, however, as there is among the parties, as to the parameters of each element.

As this Court said in *Tinder,* a lottery awards prizes "primarily, if not solely, upon chance"; no distribution of prizes or winnings upon the basis of a "substantial degree of skill or judgment" can be a lottery. 237 Ind. at 41, 142 N.E.2d at 615. The trial court supported its conclusion that pari-mutuel betting constituted a lottery with the following finding of fact:

> "13. That furthermore the individual takes risks in choosing a particular bet in that the individual does not know until the betting is closed what the payout will be in the given pool nor what the final odds will be. Furthermore, the individual does not know the outcome of the horse race prior to the race itself. These items are variables totally beyond the control of the individual as he places his bet.
>
> 14. The evidence establishes that favorites in races win less than ⅓ of the time and the track handicapper at the Michigan Raceway, defendant's Exhibit B, demonstrates that that expert who handicaps all races for that particular date was only able to pick 36% of the payouts that date.
>
> 15. That there is no skill or judgment of the bettor which has any influence whatever over the determining events, namely, the horse race or the amount in the pool, or the odds on the payout of any given pool."

The trial court's findings and conclusions and Nixon's arguments indicate that the court below found the deficiencies in pari-mutuel betting to lie in three areas.

First the trial court discounted the skill and judgment of the bettor in selecting his bets. It is true that the bettor cannot be certain of the outcome of the race when he bets. But the bettor can decide whether to bet, on which horse, and in which finishing position, all based upon his consideration of the information provided by the racing form or program and his observations. Numerous courts have held that such an educated guess as to the race result constitutes the exercise of skill, or conversely does not reflect distribution of winnings by chance. *Engle v. State, supra; Longstreth v. Cook, supra; Ginsberg v. Centennial Turf Club, supra; People v. Monroe, supra; Rohan v. Detroit Racing Assoc., supra.* These courts discount the effect of the lack of absolute guarantees of success by offering examples of elements of chance which enter into everyday activities which are nonetheless not considered games of chance. No future event is certain, but it does not follow that every decision contingent upon future events is a lottery.

Nixon argues, however, that these well-reasoned cases are inconsistent with this Court's decision in *Hudelson v. State,* (1884) 94 Ind. 426, defining "lottery" in a statutory prohibition. A merchant offered a prize to the customer guessing nearest the number of beans in a glass globe. The Court held that chance, and not mathematical skill, determined the winner of the contest, because the deficiencies in the data available to the guesser (the irregularity and uncertain sizes of the beans, and the unknown thickness of the globe wall) would frustrate mathematical computation, and any attempted calculation would be no more than a guess.

*Hudelson* does not stand for the proposition that only mathematical precision and certainty in prediction of race results would constitute an exercise of skill in pari-mutuel betting. Most human decisions are made in areas to which mathematical techniques have not yet been successfully applied. In *Hudelson* the Court was considering a mathematical problem, estimation of a number, incapable of solution by mathematical means. Such a problem can properly be said to be dependent upon chance for its solution, but it does not follow that all problems incapable of solution to mathematical certainty are games of chance.

Nixon argues that even if information is available permitting rational efforts at prediction, many if not most, bettors ignore such information and trust in hunches or arcane "systems". This may be true, but it does not show that pari-mutuel involves the legal element of chance. It is required that pari-mutuel offer an opportunity to influence the likelihood of winning by the use of skill, and judgment in order that it not be based upon chance, but it is not necessary that every bettor avail himself of the opportunity. "It is the character of the game and not the skill or want of skill of the individual player which determines whether the game is one of chance or skill." *Engle v. State, supra* at 53 Ariz. 469, 90 P.2d 993. See also *Longstreth v. Cook, supra; Morrow v. State, supra* at 511 P.2d 129.

The trial court also found, quite correctly, that the bettor's winnings are limited by and dependent upon the total amounts bet and the distribution of those bets. Courts which have considered this factor have generally not found it to vitiate the bettor's opportunity to exercise skill and judgment. *Rohan v. Detroit Racing Assoc., supra; People v. Monroe, supra; Utah State Fair Assoc. v. Green, supra; contra, State ex rel. Moore v. Bissing, supra.*

While these factors operate to limit the amount which can be won by the bettor in the exercise of his skill and judgment, and while they are beyond his control and largely beyond his prediction, I do not believe that they thereby render the betting a lottery. Regardless of the total amount and distribution of the bets, the bettor's skill in selecting winning horses influences the amount of his winnings. That skill and the factors in question at most operate independently in determining the bettor's winnings.

The Alaska Supreme Court's perceptive analysis of the role of chance in *Morrow v. State, supra*, suggests that a determining factor dependent on chance may vitiate the effect of the opportunity to employ skill only when it intervenes between the skill used and the final result and insulates them from one another. In few human endeavors is the return completely isolated from chance and wholly dependent on the efforts expended.

Finally the trial court's Finding No. 14 suggests an attempted empirical demonstration of the absence of influence of skill and judgment on the outcome of the betting. On a given date an expert at a Michigan racetrack selected "paying" horses in only one-third of his selections. Contrary to Nixon's assertions, this showing establishes nothing. A demonstration that presumably highly skilled bettors do no better on the average than bettors who use some means of random selection would tend to show an absence of influence of the "skill" asserted by appellants. But we are shown only the success rate of the skilled bettor, and cannot determine how his rate compares with that of an "unskilled" bettor. There is no absolute rate of success which is a requisite of "skill."

The trial court's holding that the system or pari-mutuel wagering authorized by the Pari-Mutuel Wagering Act constitutes a lottery and that the Act contravenes Article 15, § 8, is erroneous, and the judgment cannot be supported on those grounds. I would reverse that judgment.

HUNTER, J., concurs.

HUNTER, Justice, dissenting.

I have concurred in my brother DeBruler, J.'s, dissent, but I wish also to set forth the results of my independent research which I think should be judicially expressed. It seems quite apparent that the majority opinion has resorted to a public policy reasoning under the guise of liberal constitutional interpretation.

It has long been recognized in this state that the public policy of the state is de-clared by the constitution and by the legislative acts, and, where these two sources are silent by the declarations of the courts. *Russell v. Johnson,* (1942) 220 Ind. 649, 46 N.E.2d 219; *Hogston v. Bell,* (1916) 185 Ind. 536, 112 N.E. 883. Of these various sources it has been recognized that the immediate representatives of the people in the legislature are the fairest exponents of what public policy requires, as they are most familiar, with the habits and fashions of the day and the actual conditions in the business community. If, in the domain of economic and social controversies, a court were, under the guise of the application of the doctrine of public policy, to interpret a statute or constitution in a way which it might consider expedient and desirable, such action would be nothing short of judicial legislation, and each such court would be creating positive laws according to the particular views and idiosyncrasies of its members. Only in the clearest cases, therefore, should a court declare a statute unconstitutional. *Russell, supra; Hogston, supra;* 72 C.J.S. Policy, p. 213; and numerous cases cited therein.

The majority opinion sets out many citations of authority which uphold liberal construction of constitutional provisions. This resort to such citations is completely meaningless in the manner in which they are employed and applied in the instant case. Some of these cited authorities are: *California Employment Stabilization Commission v. Municipal Court, etc.,* (1944) Calif. Court of Appeals, 1st Dist., 62 Cal.App.2d 781, 145 P.2d 361; *Unemployment Reserve Commission v. St. Francis Homes Association,* (1943) Calif. Court of Appeals, 1st Dist., 58 Cal.App.2d 271, 137 P.2d 64; *State ex rel. Jones v. Lockhart,* (1953) 76 Ariz. 390, 265 P.2d 447; *Kirkpatrick v. King,* (1949) 228 Ind. 236, 91 N.E.2d 785; *State v. Gibson,* (1871) 36 Ind. 389, 391; *State ex rel. Black v. Burch,* (1948) 226 Ind. 445, 457, 80 N.E.2d 294; *State ex rel. Holt, et al. v. Denny, Mayor, et al.,* (1888) 118 Ind. 449, 458, 21 N.E. 274.

Any citations concerning liberal construction are completely unnecessary for the reason that the term "lottery" is well defined

and was comprehended to have a very concrete and definite meaning, i. e., the most simple definition of a lottery is: a game of chance by lot *only*. Thus, at the time of ratification it was so understood.

It seems apparent from our study of case law that liberal construction of constitutional provisions which are indulged in by the courts to uphold the public policy of legislation has been used in the instant case to declare pari-mutuel legislation unconstitutional.

In other words, the construction here employed in this manner could lead to capricious, mischievous, or absurd results based upon an individual judge's notions concerning social, moral, or economic controversies. The public policy of a state must not be founded in the court's personal views on sociological problems.

The Nebraska case, *State ex rel. Sorensen v. Ak-Sar-Ben Exposition Co.*, (1929) 118 Neb. 851, 226 N.W. 705, cited by the majority is really of little guiding value in this matter. The Nebraska Constitution is more broadly worded than our Indiana Constitution and includes a prohibition against "any games of chance." The Nebraska Supreme Court stated that since a pari-mutuel system included the concept of a pool this *necessarily* constituted a game of chance. This should have no effect on our interpretation of a lottery. However, even if we were to assume that the constitutional provisions were identical, a pooling, in itself, does not constitute a lottery. A lottery has *no* elements of individual control over outcome. The selection of a horse within the pari-mutuel system does negate the pure chance element which is basic to a lottery.

The majority opinion has also emphasized at great length the case of *Commonwealth v. Kentucky Jockey Club*, (1931) 238 Ky. 739, 38 S.W.2d 987, which makes it readily apparent that the majority is basing its decision upon public policy as the Kentucky court did for its state. This Court cannot make the Kentucky decision any more judicially palatable by declaring that it honestly faced the problem of investments by individuals and then decided by reason of the

public policy that pari-mutuel betting in Kentucky was therefore constitutional.

As we have pointed out, the term "lottery" is clearly defined, and any attempt by the courts to expand the simple definition is an invasion of the legislative prerogative. The two departments of our government which are primarily charged with the responsibility of determining public policy have acted. The legislative passed the pari-mutuel bill; the executive vetoed it; then again evidencing its constitutional authority, the legislature overrode the governor's veto. That should have been the end of any public policy argument concerning pari-mutuel.

For all the foregoing reasons I would overrule the trial court's judgment.

DeBRULER, J., concurs.