**SCOTT COUNTY, Indiana, Appellant,**

**v.**

**James O. VAUGHN, et al., and State of Indiana, Appellees.**

No. 72A05–9805–CV–271.

Court of Appeals of Indiana.

Dec. 23, 1998.

Rehearing Denied Feb. 19, 1999.

G. Richard Potter, Stephenson Daly Morow & Kurnik, Indianapolis, for Appellant.

David V. Scott, Scott & Forrest, New Albany, Jeffrey A. Modisett, Attorney General, Jon Laramore, Deputy Attorney General, Indianapolis, for Appellees.

## OPINION

RILEY, Judge.

### STATEMENT OF THE CASE

Defendant–Appellant Scott County, Indiana (Scott County) appeals from the negative judgment in favor of Plaintiffs–Appellees James and Malinda Vaughn (The Vaughns). Defendant below, the State of Indiana, joins this appeal as an appellee.[1]

We affirm.

### ISSUES

Scott County raises two issues for our review which we re-state as:

1. Whether the State's use of a loan receipt agreement as a settlement tool is contrary to Article XI, Section 12 of the Indiana Constitution, which prohibits the

---

1. Third party plaintiffs Ike and Cathy Routt, on behalf of their minor child Jennifer Routt, are not a party to this appeal.

State from loaning state funds to private individuals.

2. Whether the State's use of a loan receipt agreement in this case is contrary to public policy as it was used as a settlement tool to the detriment of a political subdivision of the State.

## FACTS AND PROCEDURAL HISTORY

The accident underlying this appeal occurred on October 14, 1992, when Malinda Vaughn was traveling on County Road 150 South in Scott County. Tonya Vaughn, Malinda's daughter, was a passenger in the vehicle. Third party plaintiff below Ike and Cathy Routts' daughter, Jennifer Routt, was also a passenger in Malinda's vehicle. As Malinda approached the intersection of County Road 150 South and State Road 3, Malinda's vehicle entered the intersection and was struck by a northbound vehicle traveling on State Road 3. The Vaughns assert that Malinda was not able to see the intersection itself or the stop sign located at the intersection until she had crested the hill and was parallel to the stop sign. Upon impact, Jennifer Routt and Tonya Vaughn were thrown out of the rear window of Malinda's 1991 Chevrolet Blazer. Malinda Vaughn and Jennifer Routt were severely injured, and Tonya Vaughn was killed as a result of the accident.

On March 7, 1994, the Vaughns filed suit against the State of Indiana and Scott County alleging negligence against both defendants for failure to exercise reasonable care in the design, construction, and maintenance of the intersection. The State and Scott County filed separate answers to the Vaughns' complaint in April of 1994. The Routts were joined into the lawsuit as a necessary party in May of 1994, and the Routts subsequently filed their third party complaint for damages against the State and the County. In December of 1994, the County filed its motion for summary judgment against both plaintiffs arguing that it owed no duty to either plaintiff. Following a hearing, the trial court granted the County's motion.

In September of 1995, the decision of the trial court was reversed by this court in a memorandum decision. In our unpublished memorandum decision, we held that the

State and the County had a simultaneous duty with respect to the safety of the intersection and the alleged inadequacy of the signage. Hence, we held that genuine issues of material fact existed with regard to whether breach of the duties proximately caused the injuries alleged. *Vaughn/Routt v. State of Indiana/Scott County*, No. 72A01–9506–CV–194 (Robertson, J., Sept. 27, 1995).

Following negotiations, the Routts and the Vaughns entered into loan receipt agreements with the State. Specifically, on October 20, 1995, the Routts entered into a loan receipt agreement whereby the State advanced the sum of $200,000.00 to the Routts, and on April 10, 1996, the Vaughns entered into a loan receipt agreement whereby the State advanced the sum of $400,00.00 to the Vaughns. Both agreements contained a provision providing for the repayment of the loan if the plaintiffs should collect money damages from any other entity, including Scott County.

On November 6, 1997, the County filed a motion to set aside the loan receipt agreements arguing that they were unconstitutional. The State intervened, and responses were filed. Following a hearing, the trial court denied the County's motion to set aside. The County petitioned to certify the issue for interlocutory appeal, which petition was granted by the trial court. We subsequently accepted jurisdiction on June 9, 1998. This appeal ensued.

## DISCUSSION AND DECISION

### I. Loan Receipt Agreements Ind. Const. Art. XI, § 12

The County contends that the trial court erred in denying its motion to set aside the loan receipt agreements, because they were entered into in violation of Article XI, Section 12 of the Indiana Constitution.

#### A. Loan Receipt Agreements Defined

We first found reference to the "loan receipt" instrument in *Klukas v. Yount*, wherein this court in 1951 stated that "[a] loan receipt is an instrumentality which permits the insurer to pay an insured speedily and yet press in court to recoup its losses from the wrongdoer without the insurer appearing

by name, thereby avoiding some of the consequences of subrogation." 121 Ind.App. 160, 98 N.E.2d 227, 229 (Ind.Ct.App.1951).

Loan receipt agreements or "partial settlement agreements," as they are sometimes referred to, were described by Judge Robertson in *Burkett v. Crulo Trucking Co, Inc.* as follows:

A loan receipt agreement, in its simplest form, provides that one with potential liability to a claimant will advance funds in the form of a non-interest loan to the claimant in order that the claim may be prosecuted against another who is also potentially liable for the claim. In return for the funds advanced, the claimant agrees that he will not sue or will not seek to enforce a judgment against the lender and will repay the loan according to some formula based upon the claimant's recovery against the other party. Such an agreement, then, serves to limit the liability of one against whom a claim might be pressed and, at the same time, gives the claimant an immediate 'bird in hand' instead of forcing him to await but possible recovery following protracted litigation.

171 Ind.App. 166, 355 N.E.2d 253, 258 (Ind. Ct.App.1976). The judicial policy of this State strongly favors the use of partial settlement agreements. *Manns v. State, Dept. of Highways*, 541 N.E.2d 929, 932 (Ind.1989).

The loan receipt agreement entered into between the State and the Vaughns provides in pertinent part as follows:

The State of Indiana will advance to Malinda Vaughn the sum of FOUR HUNDRED THOUSAND DOLLARS ($400,000.00), as a loan, without interest, repayable to the extent Malinda Vaughn ... collects money in damages from any other person, firm, organization or other entity, including Scott County, for the injuries sustained by her and/or her daughter as a direct and proximate result of the aforementioned collision.

Malinda Vaughn ... agrees to repay the full extent of the loan ($400,000.00) by forwarding to the State SEVENTY PERCENT (70%) of the entire amount collected from any other party, person, organization or entity, including, but not limited to, Scott County, LESS 30% attorney fees.

In no event shall the amount repaid to the State by Malinda Vaughn ... exceed FOUR HUNDRED THOUSAND DOLLARS ($400,000.00).

Malinda Vaughn ... will dismiss with prejudice her claims against the State of Indiana only, expressly reserving her right to proceed against Scott County ...

(R. 567–568).

### B. *Constitutionality under Art. XI, § 12*

Specifically, the County argues that the State has loaned public funds to private individuals in contravention of Article XI, Section 12 of the Indiana Constitution. Article XI, Section 12 of the Indiana Constitution states as follows:

The State shall not be a stockholder in any bank; nor shall the credit of the State ever be given, or loaned, in aid of any person, association or corporation; nor shall the State become a stockholder in any corporation or association.

 Questions arising under the Indiana Constitution are to be resolved by "examining the language of the text in the context of the history surrounding its drafting and ratification, the purpose and structure of our constitution, and case law interpreting the specific provisions." *Boehm v. Town of St. John*, 675 N.E.2d 318, 321 (Ind. 1996) (quoting *Ind. Gaming Comm'n v. Moseley*, 643 N.E.2d 296, 298 (Ind.1994)). In construing the constitution "a court should look to the history of the times, and examine the state of things existing when the constitution or any part thereof was framed and adopted, to ascertain the old law, the mischief, and the remedy." *Boehm*, 675 N.E.2d at 321 (quoting *Bayh v. Sonnenburg*, 573 N.E.2d 398, 412 (Ind.1991), *cert. denied*). It is well-settled that constitutions are to be liberally construed. *State v. Nixon*, 270 Ind. 192, 384 N.E.2d 152, 156 (Ind.1979). Constitutions are afforded liberal construction because the powers and restraints dealt with in constitutions are unlimited. *Id.* Constitutions are expected to operate over a long period of time. *Id.* The "pole-star in the construction of [the] constitutions is the intention of the makers and adopters." *Id.* at

157 (quoting *United States v. Lefkowitz,* 285 U.S. 452, 52 S.Ct. 420, 76 L.Ed. 877 (1932)).

*Northern Indiana Bank and Trust Co. v. State Bd. of Finance of Indiana,* involved an action for declaratory judgment regarding whether a statute permitting state and municipal corporations to deposit funds in deposit-type savings associations violated Article XI, § 12 of the Indiana Constitution. Ultimately, the supreme court held that the State had not become a stockholder in violation of Article XI, § 12 by reason of its deposit of public funds in savings associations which were not depositories under the Depository Act of 1937. 457 N.E.2d 527, 529 (Ind.1983). In so holding, the court reviewed the pertinent history surrounding the ratification of Article XI, § 12. Although the case dealt primarily with the first and third clauses of Article XI, § 12, the legislative history sheds considerable light on the intent of the framers of the entire section. The Indiana Constitution was adopted in 1850. In so noting, the *Northern Indiana Bank* court stated that "[t]wo major issues in the years prior to 1850 were directly responsible for Art. XI, § 12." *Id.* The issues were the State Bank issue and the internal improvement system.

In 1834, the Indiana Legislature chartered the State Bank, authorized the State to buy fifty percent of the Bank's stock, and gave the Bank the power to issue currency. The State Bank generally monopolized the entire banking industry, and there was bitter opposition to its continued existence. Members of the opposition advocated a "free bank" system, in which the State played no active role. Debate on this issue occupies several hundred pages in the Report on the Debates and Proceedings of the Convention for the Revision of the Constitution (hereinafter "Constitutional Debates of 1850"). Several resolutions were offered and ultimately the Convention accepted the following language: "The State shall not be a stockholder in any bank, after the expiration of the present bank charter ..." This clause of Article XI, § 12 was sought to prevent the State from re-chartering the State Bank after its original charter expired in 1857. *Northern Indiana Bank,* 457 N.E.2d at 529 (citing Constitutional Debates of 1850).

The second major impetus to the drafting of Article XI, § 12 was the pre–1850 internal improvement system. In 1836, the Indiana Legislature passed the Internal Improvement Act, which provided for the construction of turnpikes, railroads and additional infrastructure within the State. The Act established a Board and granted control of the purse strings to the Board. Ultimately, the entire system failed and many of the projects were left unfinished. During this period, the State Bank lent substantial sums of money to private industry, but also began to buy stock in these corporations. The State was speculating on the potential money to be made with the State's improved internal infrastructure. Because the internal improvement plan failed, the State was nearly bankrupt by 1839.

■ There was considerable debate and sentiment among the delegates to the Constitutional Convention that the State be prevented from ever again engaging in such speculative behavior with public funds. Hence, the second and third clause of Article XI, § 12 were intended by the framers to prevent the State from loaning money to individuals or corporations and prevent it from becoming a "partner in speculation." *Northern Indiana Bank and Trust,* 457 N.E.2d at 530. More recently in *Board of Trustees of Public Employees' Retirement Fund of Indiana v. Pearson,* 459 N.E.2d 715, 717 (Ind.1984), the supreme court stated that "[t]here can be little doubt that the general purpose of the last clause of [Art. XI, § 12] was to bar the State of Indiana from placing state money at risk in corporate stocks."

The above cases deal primarily with the first and third clauses of Article XI, § 12, while the County here contends that the State has acted in contravention of the second clause of § 12. Specifically, the County argues that the loan receipt agreements are in violation of that portion of Article XI, § 12 which states, "... nor shall the credit of the State ever be given, or loaned, in aid of any person ..." This second clause of Article XI, § 12 was specifically discussed in *Johnson v. St. Vincent Hospital, Inc.,* 273 Ind. 374, 404 N.E.2d 585 (Ind.1980), wherein the supreme court considered the constitutionali-

ty of various aspects of the Indiana Medical Malpractice Act. Chapter 4 of the Act created a patients' compensation fund to be administered by the Indiana Insurance Commissioner. *Johnson*, 404 N.E.2d at 605. One of the arguments raised on appeal was that the fund violated Article XI, § 12 which prohibits the State from giving or loaning its credit in aid of any person, association or corporation. Specifically, Johnson argued that state tax money was being used to aid private enterprise. Because the cost of administering the compensation fund is paid for by public funds, it was argued that the statutory scheme was at odds with the Constitution. *Id.* at 605. The supreme court ultimately upheld the constitutionality of the Act, finding that the general fund did not become a guarantor for the obligations of the fund. *Id.* at 606. Hence, because exhaustion of the patients' compensation fund did not generate any liability for the general fund of the State, the scheme was held constitutional. *Johnson*, 404 N.E.2d at 606.

■ Because the "intent of the framers of the Constitution is paramount in determining the meaning of a provision, this court will consider the purpose which induced its adoption in order that we may ascertain what the particular constitutional provision was designed to prevent." *Boehm*, 675 N.E.2d at 321 (citations omitted). It has been repeatedly stated in the case law that Article XI, § 12 was placed in our constitution "to prevent the use of State tax money to support private enterprise and particularly public improvements financed through private corporations." *Sendak v. Trustees of Indiana University*, 254 Ind. 390, 260 N.E.2d 601, 602 (Ind.1970); *Board of Trustees of Public Employees' Retirement Fund of Indiana*, 459 N.E.2d at 717; *see also Northern Indiana Bank and Trust Co.*, 457 N.E.2d at 530. Section 12 was adopted during a period of financial disaster in the State of Indiana, and the framers sought only to prevent the State from ever again engaging in hazardous financial conduct. The loan receipt agreement entered into by the State in this case is not the type of dealing that the framers intended to prevent with the ratification of Article XI, § 12. In fact, the governor is statutorily granted the unfettered power to "settle a claim or suit brought against

the state or its employees." Ind.Code § 34–13–3–14.

Using the liberal approach to constitutional construction and considering the fundamental principle of such construction is to give effect to the intent of those who framed the provision, we cannot say that the use of a loan receipt agreement in this case was an evil that the framers sought to prevent by ratifying Article 11, § 12 of the Indiana Constitution.

## II. *Loan Receipt Agreements Public Policy*

Scott County urges this court to reconsider the continued use and validity of loan receipt agreements in Indiana. While acknowledging that loan receipt agreements have been deemed permissible in civil cases, Scott County argues that the agreements have been the subject of much debate and have been deemed void as against public policy in other jurisdictions. The County further argues that if this court is not willing to denounce the use of loan receipt agreements in general, we should at a minimum declare it against public policy in this specific case.

Scott County contends that the time is ripe for this court to find loan receipt agreements void as contrary to public policy. Specifically, the County argues that the agreements promote prolonged litigation between the remaining parties, adversely alter the trial process, mislead the trier of fact, and promote unethical collusion between the parties.

■ We recognize that loan receipt agreements have been treated with apprehension by the courts in the past. For example, in *Sullivan v. American Cas. Co. of Reading, Pa.*, 582 N.E.2d 890, 899 fn. 8 (Ind.Ct.App. 1991), we noted that even though fifteen years had elapsed since Indiana first recognized the validity of loan receipt agreements in *Burkett v. Crulo Trucking Co.*, 171 Ind. App. 166, 355 N.E.2d 253, they were still the source of controversy in the courts. Specifically, we said that

[a]lthough 'covenants not to sue, covenants not to execute, and loan receipt agreements are legal and are to be encouraged in the settlement of litigation ... controversy [still] arises regarding the use of

such settlement agreements....' [One of the fears] is the collusive effect loan receipt agreements have between the parties. Once the potentially liable party has entered into a loan receipt agreement and has advanced funds to the plaintiff, that party will have little, if any, incentive to participate vigorously in [the] truth-finding function of the trial process. In fact, in most situations, it may be to a settling defendant's advantage to assist the plaintiff, because to the extent the plaintiff recovers from a non-settling defendant the settling defendant will be entitled to reimbursement for the money 'loaned.'

(Citations omitted).

To be sure, loan receipt agreements cause considerable concern during the trial of a plaintiff's remaining unresolved claims against a non-settling defendant. However, many of the problems with loan receipt agreements have been judicially remedied, and the courts have continued to favor their use. For example, in *Manns v. State Dept. of Highways*, 541 N.E.2d 929, 932, the Indiana Supreme Court discussed the problematic nature of partial settlement agreements during subsequent trials and said that

[t]he admission of prior partial-settlement evidence rarely provides probative and relevant evidence and generally injects extraneous, irrelevant, and confusing circumstances and issues which are likely to impair a jury in its fair and impartial ascertainment of truth. *Such negative evidentiary considerations, however, are significantly outweighed by the sound judicial policy favoring the use of partial settlement agreements as tools for prompt and amicable settlements, we conclude that the risks and hazards of their unfair use at trial should be minimized.*

Indiana has expressly approved of the use of loan receipt agreements in *Northern Indiana Public Service Co. v. Otis*, 145 Ind.App. 159, 250 N.E.2d 378 (1969); however, the parameters for their use have continued to be defined over the years. We do not believe that such agreements are contrary to public policy, as a whole or in this particular case. The State's use of a loan receipt agreement in this case permitted the Vaughns to settle their litigation against the State while leaving open the possibility of reimbursement if the Vaughns should collect a future judgment from the County. We therefore affirm the decision of the trial court.

### CONCLUSION

Based on the foregoing, we conclude that loan receipt agreements continue to represent a valid settlement tool in Indiana and do not run counter to Article XI, Section 12 of the Indiana Constitution. We further hold that the use of such agreements are not against public policy.

Affirmed.

RUCKER and GARRARD, JJ., concur.