Hon. John D. Quinn Director The New York State Lottery
I acknowledge receipt of your letter of August 31, 1981, concerning the installation of certain electronic games which the New York State Division of the Lottery (the "Division") is considering offering to the public as a supplement to the lottery games now available. In my opinion, the specific games described to us are prohibited by both the Constitution of the State of New York and by its statutory law.
The Division has explained to us its desire to develop new types of games which will be of interest to present and potential lottery players. The Division is eager to generate new revenues for education in the State and also to reduce the labor costs involved in processing lottery play. In connection with these concerns, the Division entered into a contract with Multigame Ventures, Inc. ("Multigame"), dated as of May 7, 1981, whereby that company undertook (subject to certain controls by the Division) to develop and administer certain electronic games of chance to be made available to the playing public throughout the State.
Pursuant to that contract, Multigame has proposed a number of possible games to the Division and has conducted experimental sessions involving several of the games of greatest apparent interest. It planned to install gaming machines for actual play in a limited number of locations on a trial basis sometime this month. It is in part because of these pending plans that you have asked me to respond on this issue with particular speed. Your office has described two of these specific games, a computer poker game and a computer version of twenty-one or blackjack. Multigame has advised us that there is a third game, black magic or red devil, which it wishes to test together with these two initial games. We have considered all three games. We recognize that given the flexibility of the machines, the specific rules of any one game can readily be changed, and indeed the games exhibited to us by Multigame involved different rules than were provided to us by the Division. My legal opinion is based upon the specific games presented to us by Multigame on August 28, 1981. However, the general principles which impel this opinion should be applicable to other possible uses of the machines.
THE MULTIGAME COMPUTER TERMINAL AND PROGRAMMED GAMES
The Division's contract with Multigame contemplates the installation of an appropriate number of on-line computer terminals in a number of licensed locations, such as bars, stationery shops, food stores, etc. The initial number of installations would be limited, but, assuming popular acceptance, terminals would eventually be placed in many hundreds of licensed locations promising sufficient business. Each terminal would be capable of playing a numer of different gambling video games. Initially, there would be a choice of three games: poker, twenty-one and red devil. Multigame has supplied us with a memorandum describing the games and has also provided an opportunity to examine the game-playing terminal. We follow their description of the games.
Poker I — Million Dollar Match. This game would operate as follows: Upon the player's insertion of $1, five cards, chosen randomly by a computer from a deck of 52 electronic playing "cards," are displayed on the video screen. At this point, the player's bank account as shown on the screen is reduced from $1 to 50¢. If the player's beginning hand is of sufficient quality, a chit reflecting his winnings is immediately issued. At the player's option and upon the additional debiting of 50¢ from the player's bank account, the player may exchange up to five cards. If the player receives a winning combination of cards, the video machine automatically issues a chit for the exact amount won, provided that the winnings exceed $2.50. Upon winning $2, the player is given the option of withdrawing his winnings or continuing to play. Any winnings less than $2 are to be paid together with future earnings and may be used by the player to play additional games. Chits representing winning amounts up to $200 (the highest possible prize in the instant portion of the game) will be redeemed in cash by the lottery agent.
The instant prizes range from 50¢ for jacks or better to $200 for a royal flush. The game is programmed to pay out as prizes 38.5% of all money wagered, assuming that all players play with maximum skill. Since many players will be unskilled, the actual payout is expected to be closer to 30%.
After completion of the instant portion of the Poker game, the player is given the option of participating, at an additional cost of $1, in a drawing to be held at the end of the week. If the player chooses to participate, the machine issues a ticket showing the five cards that he has received during the preceding instant game and which are shown on the screen at the time. To win, the player's cards must match the cards drawn at a weekly drawing. By random draw, five envelopes will be selected from a group of fifty-two envelopes, each of which will contain one card from a fifty-two card deck. Any player who holds a ticket with the selected five cards would win a prize of $1,000,000.
Twenty-one or blackjack. This computer game is similar to the conventional card game. Upon the insertion of $1, the machine displays four cards, two for the player and two for the machine, exposing only one of the machine's cards. The player is then called upon to decide whether to request additional cards or to stand. When the player finishes drawing, the machine must draw until it reaches a score of seventeen or more. If the player's hand beats the machine's hand, the player would win $2, consisting of his original $1 plus winnings of $1. The player, however, must win $3, including his initial $1, to receive a winning chit. Winnings of less than $3 may be used to play additional games. The only cash prize in the twenty-one or blackjack game is $3, and a winning chit in this amount is printed each time the $3 cash-out threshold is reached. Winnings will be redeemed by lottery agents.
Assuming maximum skill on the player's part, the payout projected for this game would be 39% of all money bet. Again, the actual payout should be substantially less.
Red Devil. This is the simplest of the three games proposed. Upon the player's insertion of $1, the player is entitled to two games of play, each costing 50¢. In each game, three cards, chosen randomly by the computer from a "deck" of 52 cards, are displayed on the video screen. To win $1, all three cards must be black. If the player receives only two black cards, the player is given the opportunity to play a free game. Less than two black cards is a losing game. Each time the player wins in Red Devil, he is given the option, until he receives a maximum of 12 cards, of either terminating the game and receiving his winning chit, or seeking a greater prize by requesting an additional card. Upon receiving his first red card, the player forfeits any prize that he had already won. If the player decides to terminate the game, rather than continue to seek additional cards, the machine will automatically issue a winning chit for the prize won. As previously described, winnings would be redeemed by the licensed lottery agent (in amounts up to $599) or by the Division. The top prize, which is given for 12 consecutive black cards, is $2500.
Except for the optional lottery ticket which can be purchased in the non-instant portion of the poker game, no lottery tickets are issued by any of these games, only chits used in redeeming winnings. Multigame does refer to such chits as "tickets," but in no sense are they "tickets" evincing a right to participate in a lottery, but merely records of gambling winnings convertible into cash.
THE HISTORY OF LEGAL GAMBLING IN NEW YORK
In general, all kinds of gambling not expressly authorized have been prohibited in New York by constitutional provision since the Constitution of 1894. Lotteries have been banned by constitutional provision since 1821. Useful historical material on the early history of lotteries in New York can be found in Matter of Dwyer, 14 Misc. 204 (Sup Ct, Kings Co, 1894) and People v Lavin, 93 App. Div. 292 (1st Dept, 1904), reversed,179 N.Y. 164 (1904); such material need not be repeated here. In recent decades, four material amendments have been made to the basic constitutional provision prohibiting all kinds of gambling. First, in 1939, the constitution was amended specifically to permit pari-mutuel betting on horse races. Then, in 1957, an amendment was adopted which, by local option, allowed religious, charitable and certain non-profit groups to conduct certain specific games of chance, commonly known as bingo or lotto. In 1966, following the lead of New Hampshire, which approved a lottery sweepstakes effective 1965, New York became the second state in modern America to authorize a state lottery. Finally, in 1975, the special exception for religious, charitable and certain non-profit groups was expanded, authorizing the playing of certain additional games of chance beyond bingo or lotto.
Article I, § 9 of the New York Constitution now reads, in relevant part:
 I. . . . [E]xcept as hereinafter provided, no lottery or the sale of lottery tickets, pool-selling, bookmaking, or any other kind of gambling, except lotteries operated by the state and the sale of lottery tickets in connection therewith as may be authorized and prescribed by the legislature, . . ., and except pari-mutuel betting on horse races as may be prescribed by the legislature . . ., shall hereafter be authorized or allowed within this state; and the legislature shall pass appropriate laws to prevent offenses against any of the provisions of this section.
 2. Notwithstanding the foregoing provisions of this section, any city, town or village within the state may . . . authorize, subject to state legislative supervision and control, the conduct of one or both of the following categories of games of chance commonly known as: (a) bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random; (b) games in which prizes are awarded on the basis of a winning number or numbers, color or colors, or symbol or symbols determined by chance from among those previousiy selected or played, whether determined as the result of the spinning of a wheel, a drawing or otherwise by chance. If authorized, such games shall be subject to the following restrictions, among others which may be prescribed by the Legislature: (1) only bona fide religious, charitable or . . . non-profit organizations shall be permitted to conduct such games; . . . Nothing in this section shall prevent the legislature from passing laws more restrictive than any of the provisions of this section.
The amendment to the Constitution approving "lotteries operated by the state and the sale of lottery tickets in connection therewith" was first approved by the Legislature in 1965 and approved for the necessary second time in 1966. It was ratified by a majority of the voters in the November election of that year, effective January 1, 1967. In 1967, the Legislature (indeed, the same legislators who re-approved the constitutional submission in 1966) adopted the necessary enabling action, now found as Tax Law § 1600 et seq., also known as the New York State Lottery for Education Law.
As indicated the first modern American lottery was introduced by New Hampshire in 1964. It was structured in the form of a sweepstakes. Participants purchased lottery tickets to participate in drawings, initially held two times each year. New York, the first state to follow New Hampshire's lead, created its state Lottery Division to operate its lottery games initially along the lines of the New Hampshire model, although the early New York lotteries were held twelve times a year. Over the years, the details of the New York lottery have changed several times, with increasing frequency of the games, and, in recent years, with the introduction of new versions of the conventional game; the most recent and popular innovations have involved the introduction of a numbers game and an instant lottery. In the former, the player in essence selects his own three-digit lottery number ticket; in the latter game, the winning tickets are selected in advance and are then randomly distributed among all tickets to be sold, with the ticket purchaser removing the material masking the lottery number to learn, on the spot, whether or not his ticket has been "drawn" as a winner.
THE CONSTITUTIONAL MEANING OF "LOTTERY"
A critical issue involved in responding to the question raised consists of determining the meaning of the key terms: "lotteries operated by the state and the sale of lottery tickets in connection therewith" as used in the Constitution. The phrase is not defined in the Constitution itself. However, what the phrase intended to sanction, and more importantly, what it did not authorize, is clear from an analysis of the constitutional provision itself, related constitutional and statutory provisions, and the legislative intent.
Pursuant to Article I, Section 9, all gambling is constitutionally prohibited in New York except as expressly allowed by specific exceptions. The decision to establish a State lottery is one such exception, but it is of narrow scope. It cannot be read as a blanket authorization to offer all sorts of games of chance to the public without doing violence to the constitutional scheme and without so expanding the limited authorization as to swallow the basic constitutional prohibition. I am persuaded that neither the Legislature nor the people intended any such result.
ANALYSIS OF THE CONSTITUTION AND RELATED STATUTES
First, the exception to the prohibition against gambling in Article I, Section 9, relating to lotteries, speaks expressly in terms of "lotteries operated by the state and the sale of lottery tickets in connectiontherewith." Thus, the Constitution is explicit that the sale of tickets, representing lots or chances, is an integral and essential element of the kinds of lotteries the State is authorized to operate.
All lottery games heretofore offered by the Division have involved the sale of lottery tickets to all players, signifying an opportunity for each player to win a prize by lot or chance.
However, with one exception, there are no lottery tickets, involving lots or chances, in the proposed computer games. Specifically, losers of the blackjack and red devil games will receive nothing; winners will receive a receipt or record of their winnings from bets in the non-lottery aspect of the game — not a ticket to participate in a lottery scheme.
In the proposed computer poker game the situation is the same except a player may convert his "hand" into a conventional lottery ticket upon payment of an additional fee. Standing alone, such a lottery ticket generated by a machine might well pass constitutional muster. However, this true lottery aspect of the proposed computer poker game is but an incidental and separate aspect of the entire poker game, and one not reached until after the non-lottery aspect of the game has been played and completed.
Second, nothing in the specific language of the 1966 constitutional exception sanctioning state-operated lotteries can support a contention that the Legislature or the people intended to approve otherwise illegal slot machines, poker or blackjack games played for money.
In New York, "slot machines" are defined in Section 225.00 (8) of the Penal Law as:
. . . a gambling device which, as a result of the insertion of a coin or other object, operates, either completely automatically or with the aid of some physical act by the player, in such manner that, depending upon elements of chance, it may eject something of value . . . [It is not] any less a slot machine because, apart from its use or adaptability as such, it may also sell or deliver something of value on a basis other than chance . . . (Penal Law § 225.00 (8)).
In my opinion, the proposed electronic games involved the use of what amounts to a slot machine.* In addition, as variations of poker and twenty-one played for money, the proposed games constitute illegal "gambling" under definitional and operative sections of the Penal Law (§ 225.00 (1) and (2), et seq.).
The exception to the general constitutional prohibition against gambling makes no mention of these types of gambling activity — only "lotteries" and the sale of lottery tickets in connection therewith. If specific contests of chance, such as those proposed, were intended to be authorized by the lottery amendment, the Legislature could have specifically provided for them. Such was the case in 1957 when the Legislature proposed an earlier amendment to Article I, § 9, authorizing religious, charitable or non-profit organizations to conduct "specific games of chance, commonly known as bingo or lotto." (Article I, § 9, subd. 2.)
Alternatively, the Legislature, in crafting an exception to the broad constitutional prohibition against gambling easily could have employed general authorizing language indisputably encompassing the gambling activities herein proposed. It chose none of the several approaches available.
Subsection 2 of Article I, § 9, in existence at the time of the lottery amendment, uses the phrase "games of chance." Had the Legislature used this phrase, unqualified, as the basis for an amendment authorizing State-operated gambling, State-operated poker and blackjack played for money would have been sanctioned. Instead, the Legislature used the much narrower term: lottery.
Article I, § 9 itself, after expressly prohibiting lotteries, pool-selling and bookmaking, proceeds to prohibit generally "any other kind of gambling." The Legislature could have employed this phrase or a qualified version thereof in the exception clause to legalize a wide range of State-operated gambling activities. It did not do so.
In 1965, the same Legislature which framed and initially approved the lottery amendment also completely revised the Penal Law. As a result of this revision, when the Legislature took up the constitutional amendment, it had before it new definitions of "contest of chance" and "gambling" (§ 225.00, subsections 1 and 2), broad enough to include lotteries, slot machines, poker, twenty-one, red devil and other games or contests. It chose, however, not to use these expansive definitions in fashioning the constitutional exception.
The 1965 Penal Law revision, referred to above, also enacted separate definitions of "slot machine" (§ 225.00 (8)) and "lottery" (§ 225.00 (10)), evidencing the Legislature's full awareness of the difference between the two types of gambling activity when it drafted and passed the constitutional amendment during the same session.
The revised Penal Law contains a new definition of "lottery." (§ 225.00 (10)). Using standard principles of construction, in the absence of strong contra-indication, we must assume that the Legislature intended the word lottery to have the same meaning in the Constitution as was set forth in the Penal Law. (The constitutional amendment authorizing state-operated lotteries, of course, contains the further limiting language "and the sale of lottery tickets in connection therewith" as discussed above.) Then, and now, the Penal Law defines "lottery" as:
 ". . . an unlawful gambling scheme in which (a) the players pay or agree to pay something of value for chances, represented and differentiated by numbers or by combinations of numbers or by some other media, one or more of which chances are to be designated the winning ones; and (b) the winning chances are to be determined by a drawing or by some other method based upon the element of chance; and (c) the holders of the winning chances are to receive something of value."
Two points concerning this definition are worth emphasis. The Legislature conceived of a lottery as a scheme involving multiple participants, or "players." The notion of a single player pitted against a machine is foreign to the common and traditional understanding of the term lottery. In any individual game played upon the machines you proposed programmed for the presently indicated games, there can be but a single player per game. Second, a critical element of the definition is that lottery is a game or scheme involving "chances." One of the standard dictionary definitions of the word "chance" is "lottery ticket or lot." In each of the three subsections of the Penal Law definition of "lottery" the word "chance" is used to mean "lot." (The second time the word appears in subsection (b) it is used with the meaning of unexpectedness or randomness. Thus, in New York, a lottery requires a lot.
No New York cases have equated mechanical or electronic slot machines with lotteries. In fact, under Penal Law provisions existing prior to 1965, prosecutions for the possession, operation or use of illegal slot machines were always brought under provisions of the Penal Law relating to gambling and not under the lottery provisions. A 1963 Opinion of the Attorney General explicitly acknowledged the difference in the two concepts in concluding that a punchboard was a lottery for Penal Law purposes but not a slot machine under § 982 (2) of the old Penal Law "in which the chance relates . . . to the operation of mechanical parts" (p. 83). So too, bingo and related games, when the player pays money and receives a card which is to be filled in to obtain a prize, have been held to be lotteries, but not slot machines, for purposes of prosecution under the Penal Law. Cotraneo v. Townsend, 111 N.Y.S.2d 491 (Sup. Ct, Monroe Co. 1952). No New York cases have ever construed illegal gambling games of poker or blackjack to be lotteries.
It is noteworthy in this connection that the State Wagering Board has concluded that the game of blackjack is not a lottery under the General Municipal Law, Chapter 9-A.
I am aware that others would define "lottery" rather more broadly as any kind of gambling game which involves the elements of (1) chance, (2) consideration and (3) prize. I cannot accept this as a complete definition, and do not believe the Legislature ever intended it. Such a definition is virtually co-extensive with gambling itself. Indeed, the 1965 Penal Law defines "Contest of chance" as meaning:
 ". . . any contest, game, gaming scheme or gaming device in which the outcome depends in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." Penal Law § 225.00 (1).
There is little to distinguish an expansive definition of "lottery" and the Legislature's definition of "Contest of chance." The Legislature, however, adopted a Penal Law definition of "lottery" narrower in scope and conventional in meaning. I must follow the Legislature's lead.
LEGISLATIVE HISTORY OF AMENDMENT
The debate of the Assembly on the first adoption of the constitutional amendment authorizing state-operated lotteries was not transcribed, and apparently the amendment was approved by the Assembly the next year without debate.
However, the Senate debates on the lottery amendment indicate that the legislators shared a common conception that the New York lottery would be modeled after the sweepstakes lottery then in effect in nearby New Hampshire, with a multitude of tickets sold, with one or more to be subsequently selected as winners. The intertwined notions of tickets (or lots) and the New Hampshire sweepstakes permeate the debates.
There is absolutely nothing in the Senate debates, direct or indirect, that suggests the Legislature believed they were considering anything other than traditional lotteries involving the sale of tickets and drawings by chance to determine winners among ticket holders. Legalization of slot machines or gambling games such as poker and twenty-one was never mentioned.
One proponent of the amendment offered a simple, clear-cut definition of "lottery" as the term was used in the proposed amendment. As stated by Senator Mackell,
 There is a court definition of what lottery is. It is a prize, a consideration and multiple participation. (Tr. p. 4908)
During the 1966 debate, Senator Bloom undoubtedly spoke for the body when, in arguing against an effort to adopt an enabling act in advance of a referendum on the amendment, he argued that there was no need for statutory specifics since the fundamental nature of the lottery to be authorized by the amendment was so clear:
 SENATOR BLOOM: . . . [T]here is not much choice as to the type of plan that will be operated here, whether it is twice a year or four times a year or whether the amount of prizes would be 20% or 25% would be about the spread of the possible plan and the implementation would only be mechanical so who is being kidded? We have a general idea what the plan would be so let us not run down the people or set up road blocks that do not exist. I think it is up to the people to decide whether they want this plan or not. (p. 351)
It is clear that the Legislature used the word "lottery" in its normal, everyday sense and had in mind no esoteric or highly technical definition covering such gambling activities as poker, blackjack and related gambling. They had in mind such traditional lotteries as the familiar church raffle, Irish Sweepstakes, and the New Hampshire lottery. Indeed, the very sort of lottery games promptly thereafter authorized by the Legislature contained the traditional apparatus common to all lotteries: tickets, multiple participation and drawings of one sort or another.
The three games which Multigames has proposed are all far removed from "lotteries" as that term is traditionally understood and as it was used by the Legislature. As discussed above, at page 7, they do not involve the sale of tickets to all players, drawings for winners or even predetermined identification of winning tickets based on random selection. They involve "play" against a machine, with winners determined on the basis of machine activity, elements of player skill, and gaming probabilities.
The proposed games also violate one of the elements of the definition of lottery advanced by Senator Mackell during the first debate. Again, he defined lottery as a game involving "a prize, a consideration and multiple participation." These games, unlike all other games sponsored by the Division, do not involve multiple participation in the sense used. In a conventional lottery, a million or more people may purchase participating tickets; only one of them can win the grand prize. In the proposed computer games, the player in no sense competes against a multitude of other players on an equal basis. He plays only against the "house." Each separate game against the computer constitutes a completely new and different game, and, as a matter of game theory, nothing save probability prevents the player from winning the greatest prize the machine has to offer, two, three, four or more times in a row. The model is that of a slot machine, not a conventional lottery.
There is yet one more major predicate to my opinion that the proposed games are prohibited by the Constitution. For the past several years a debate has raged within this State on the question whether casino gambling should be authorized. Last year, the Legislature gave first passage to eight alternative constitutional amendments authorizing publicly-operated or private casinos. However, during the recently concluded session, the Legislature refused to consider the proposed constitutional amendments to allow casino gambling. If the lottery amendment to the Constitution, in fact, authorized the Division to install computer gambling machines of the sort proposed by Multigame, the debate over casino gambling would be meaningless as it relates to publicly-operated casinos. If these games are legal, then certain kinds of state-operated casino gambling are already legal. If blackjack and poker can be played with a computer instead of a croupier, then roulette, craps and other mainstays of Las Vegas or Atlantic City gambling can be similarly transformed. The versatility of the computer is such that each computer terminal could itself become a mini-casino. Clearly, the legislature would not be wasting its time discussing whether the Constitution should be amended to allow casino gambling if the Constitution already permitted casino gambling in the guise of a state lottery.
To summarize the constitutional issue then, in my view, all gambling is illegal in New York except as expressly allowed. Article I § 9. This prohibition extends to card games played for money, including blackjack and poker, and slot machines. Certain specific forms of gambling activity are permitted by virtue of express constitutional exception, such as the 1966 amendment authorizing a state lottery or the 1939 amendment authorizing pari-mutuel betting on horse racing. The lottery amendment could have been framed to authorize state-sponsored games of chance, broadly defined, but the amendment was not so framed: the authorization was limited to traditional types of lotteries.
Those who favor introduction of the proposed games in New York will no doubt argue that these electronic games are similar in many respects to non-electronic games already utilized by the Division. It is true that many similarities can be identified. What is controlling in my judgment is not the similarities, however, but the differences. Mankind has displayed characteristic ingenuity in the invention of ways to gamble. Since the taxonomy of the various forms of gambling has never to my knowledge, been precisely delineated, it is no great trick to push at the edges of any abstract definition which covers one variety of gambling games and emerge with a definition which covers a great many new varieties. In legal interpretation, however, it may be unwise to focus excessively upon abstract definitions of single terms; meaning must be sought in context as well. One need only step back a little from the immediate task of defining lottery for the problem to vanish. However much these three new games may be like old lottery games already played, the fact is that they are fundamentally like slot machines, and slot machines are illegal in New York. The proposed devices programmed with these new games are, finally, much more like casino gambling than anything the Division has ever done. The people have very clearly never authorized this sort of casino gambling. Finally, then, it requires no more than simple common sense to conclude that New York law does not presently permit these games.
THE STATUTORY ISSUES
Even if the Constitution could be construed to authorize marketing by the Division of the proposed games in issue under an extreme interpretation of the plain language and obvious intent of the Constitution, no such games could in fact be offered unless authorized in the enabling act creating the Division, Tax Law § 1600 et seq. Both the Constitutional prohibition against gambling and the exception thereto for a state-operated lottery empower and require the Legislature to implement the constitutional mandate.
Review of the relevant statutes makes it clear that the Legislature has never intended to authorize the Division to (1) offer gambling games which did not involve tickets or (2) install otherwise illegal slot machines in public places.
In April 1967, the lottery law became part of Art. 30 of the Tax Law, and the very legislators who had approved the Constitutional referendum voted a bill that provided for a traditional lottery, i.e., one involving the sale of tickets as the means of attaining a prize. Specifically, § 1303 of Article 30 of the Tax Law established a state lottery commission and § 1305 (a) empowered the commissioner "[t]o establish no more than twelve drawings in each fiscal year." Section 1305 (b) authorized the commissioner "to determine the method to be used in selling lotterytickets". It also empowered the commissioner "to purchase or lease machines through which tickets may be sold," However, such machines could not be coin operated and were to be used "only in those instances where their use would result in added convenience for purchasers and savings in administrative costs." Laws of New York 1967, ch. 278.
In March 1968, the next Legislature, in an effort to increase revenues, amended § 1305 (a) (1) of the Tax Law, inter alia, to provide for "regular drawings of the state lottery but limited to not more than one regular drawing in every week" and to provide for "special or bonus drawings." Again, this legislation was carefully tied to the sale of lottery tickets.
In April 1970, Article 30 of the Tax Law was further modified. The changes were designed to boost revenues from the lottery which was running far below expectations. New York Times, April 20, 1970, p. 1. col. 5. The modifications authorized the commissioner to run more frequent drawings, to reduce the prize of the lottery ticket below $1 and to sell tickets in bars and liquor stores. The new law also gave New York City and counties outside the city a one-third share of new lottery revenues. In a departure from the earlier legislation, the bill amended § 1305, now current Tax Law § 1604, to permit the sale of lottery tickets through coin operated vending machines, authorizing "[t]he use of vending machines or mechanical devices of any kind." This had been prohibited by the initial lottery legislation in 1967. Again, however, this legislation carefully referred throughout to tickets and provided no authorization for the use of mechanical devices outside of the clause permitting coin operated vending machines for the sale of lottery tickets. It is clear from the Assembly debate of April 20, 1970, that the Assembly never intended to authorize the Division to operate or install machines which were themselves gambling devices as distinguished from ticket vending machines.
The general contours of the state lottery bill have remained the same since 1970 and continue to refer to the sale of lottery tickets as thesole means by which lottery participants win a prize. In 1976, however, after a period in which operation of the lottery was briefly suspended, the lottery article of the Tax Law was amended so as to increase, substantially, the power, discretion and authority invested in the Division. The Division now may, without further legislative direction, determine the types of lotteries to be played, the frequency of play and the methods to be used in selling tickets. Tax Law § 1604. However, the discretion of the Division remains limited by the confines of the conventional concept of lottery embodied in the constitutional authorization and the operative provisions of the Tax Law itself. All lottery games heretofore authorized by the Legislature under the aegis of the lottery amendment involved both lottery tickets and multiple participation. Thus, Tax Law, § 1604 (a) provides, with emphasis supplied:
 "(a) . . . the [D]ivision shall have the power and it shall be its duty to operate and admininister the lottery . . . and to promulgate rules and regulations governing the establishment and operation thereof, including but not limited to the following:
1. The type of lottery to be conducted.
 2. The price or prices of a ticket or tickets in the lottery.
 3. The numbers and sizes of the prizes on the winning tickets.
4. The manner of selecting the winning tickets.
 5. The frequency of the drawings or selections of winning tickets.
 6. Without limit as to number, the type or types of locations at which tickets may by sold.
7. The method to be used in selling tickets.
 8. The use of vending machines or mechanical devices of any kind.
 9. The compensation in such manner and amounts and subject to such limitations as the division may determine to be licensed sellers of lottery tickets
but only where the division finds that such compensation is necessary to assure adequate availability of lottery tickets, and that the public convenience will be served thereby.
10. The development of an internal security plan.
 (b) The division is authorized to license agents to sell tickets for the state lottery . . ."
Similarly, § 1605 of the Tax Law provides that
 "(a) The division may license as agents to sell lottery tickets such persons as in its opinion will best serve public convenience, except that no license shall be issued to any person to engage in business exclusively as a lottery sales agent.
. . .
 (e) No employee of a lottery sales agent shall be required as a condition of employment to sell lottery tickets if his religious beliefs militate against such activity."
Nowhere is the Division empowered to license agents to house, operate and make payouts for slot machines, or otherwise conduct such traditional gambling games as poker and blackjack. Subsection (e) is also noteworthy; this provision protects religious scruples of those employees who wish not to sell lottery tickets. It would not appear to provide any solace for the scrupled employee of, say, a stationery store who did not wish to assist patrons in betting on slot machines. Why should the Legislature act to protect the job of one principled employee but not the other? Obviously because it never occurred to the Legislature that any employee in the State would ever be permitted to assist in the operation of slot machines, much less be required to do so. In enacting Tax Law § 1600 et seq. the Legislature never thought it was repealing its historic prohibition of slot machines, Penal Law § 225.30.
Section 1608 of the Tax Law cannot be read as impliedly abrogating that penal provision. Section 1608 reads:
 No other law providing any penalty or disability for the sale of lottery tickets or any acts done in connection with a lottery shall apply to the sale of tickets or acts performed pursuant to this article.
This section does not purport to immunize the Division from the Penal Law generally, but only with respect to acts performed within the scope of its limited authority. Since a slot machine is not a lottery game, and therefore not within the scope of the law, § 1608 provides no protection from the penal law to anyone trafficking in slot machines, not even employees and agents of the Division.
The computer terminals you proposed to have installed would not, in any normal sense, be vending machines. Technically, of course, computers are electronic devices, not mechanical devices at all, but more important, the only sorts of devices contemplated by the statute are those of use in selling lottery tickets. No one, I am confident, would categorize a conventional "one-armed bandit" as a vending machine. There is nothing in the computer terminals you propose to install which is to be vended except the gambling games themselves. The Legislature has never given the Division that authority.
 * * *
Even if the proposed games were not prohibited by the constitution and the statutes, I respectfully suggest that it would be imprudent to move forward with the introduction of such electronic gambling games without express direction from the Legislature. In addition to the legal considerations outlined above, these games represent a fundamental departure from the sort of gambling heretofore sanctioned by the State, and serious questions of public policy are raised.
First, all of the various forms of lottery heretofore used in New York have been pure games of chance. The poker and blackjack games proposed involve a significant element of skill. Does New York really want or need a new kind of "lottery" in which skill is materially relevant to success and where the State will benefit inequitably at the expense of the unskilled player? Heretofore, all State lottery games have provided all participants an equal chance of winning; that would not be true in the case of the poker and blackjack games you propose. I have no doubt that the terminals, if ever installed, would contain extensive disclaimers and explanations of the built-in odds; nevertheless, I question whether it will be possible to educate effectively all participants as to the extent to which the unskilled player will be even more disadvantaged than experienced player, nor the extent to which the normal odds of these games have been distorted against the expectations of the skilled player.
Second, lotteries have traditionally offered a remote chance to win a very large prize in exchange for an essentially trifling consideration. Rational gambling odds are more or less beside the point in the case of a normal lottery situation. The proposed games, however, would essentially offer trifling prizes in exchange for a trifling consideration, but in a situation where the odds are tremendously stacked against the player. In the casinos of Nevada and New Jersey, slot machines typically pay out as prizes between 85%-95% of all moneys played. An excellent blackjack player may very well beat the house. Under the games you propose, the best player in the world would, over time, win back no more than 40% of the money gambled; overall the games would probably have an actual payout of under 30%. Such a game structure is fundamentally deceptive to anyone reasonably believing himself sufficiently adept to hold his own at a social card game. These games offer the player neither a reasonable shot at breaking even nor a long shot at winning a substantial prize. I am by no means certain that the Legislature would want such games to be played at the public's expense even to the treasury's benefit.
A related policy question is this: fifteen years ago the state set up a lottery as a means of partially satisfying a substantial public wish to gamble and as a means of raising revenues for education. Under your leadership, the state lottery has become a fund raising device of real importance to the State. The State is only just now approaching the net annual lottery receipt level of $400,000,000 often mentioned when the lottery was first introduced. Nevertheless, the Legislature may well have reservations about seeking increased lottery revenues by means of glamorous, technologically advanced computer games which may be dangerously attractive to the compulsive gambler despite the very disadvantageous odds which the games provide.
A fourth problem is that of the interest youngsters will certainly have in these machines. Section 1610 of the Tax Law specifically prohibits persons under eighteen from playing the lottery. I have no doubt that you would conscientiously work to prevent children from gambling on the Multigame machines, and undoubtedly most licensees, anxious to preserve their licenses, would try to police the machines in their shops to deny minors access. But, realistically, can this be done? The computer games are so similar in attraction to the electronic pin-ball machines now so popular with youth that I have grave doubts whether it will be possible to prevent children from gambling with the games.
For all the reasons set forth above, I believe that the proposed computer games submitted for review by the Division are violative of the constitutional bar against gambling and are not authorized under the statute setting up the Division and the state lottery. To the extent that the Division may still wish to consider variations on the proposed games, or other types of electronic computer games not presented to this office, I would direct you to the Legislature for review and acquiescence before proceeding with any computer gambling contests or games which may depart from the traditional concept of a lottery.
* In a recent decision, dated May 13, 1981, the New Jersey Casino Control Commission — in approving the introduction of a similar video poker game in Atlantic City's casinos — held that such computer games were "slot machines" for purposes of § 45 of the New Jersey Casino Control Act.